IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| **AARON SETH TURNBOW**, <br><br> Plaintiff, <br><br> v. <br><br> **HILTON WORLDWIDE HOLDINGS, INC.**, <br><br> **PARK HOTELS & RESORTS, INC., F/K/A HILTON WORLDWIDE INC.;** <br><br> **HILTON INTERNATIONAL FRANCHISE LLC;** <br><br> AND <br><br> **HILTON WORLDWIDE FRANCHISING LP** <br><br> Defendants. | Case No.: 23-1154 |

## COMPLAINT

For his Complaint against the Defendants Hilton Worldwide Holdings, Inc. f/k/a Hilton Hotels Corporation, Park Hotels & Resorts, Inc., f/k/a Hilton Worldwide Inc., Hilton International Franchise LLC, and Hilton Worldwide Franchising LP, Plaintiff Aaron Seth Turnbow, by counsel, alleges as follows:

### PARTIES AND JURISDICTION

1. Jurisdiction is founded on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332.

2. Aaron Seth Turnbow ("Seth"), is a citizen of Georgia.

3. Defendant Hilton Worldwide Holdings, Inc. ("Hilton Worldwide," which shall include its predecessor, Hilton Hotels Corporation "HHC") is a Delaware corporation with its principal place of business in Fairfax County, Virginia.

4. Defendant Park Hotels & Resorts, Inc. f/k/a Hilton Worldwide Inc. ("Park Hotels") is a Delaware corporation with its principal place of business in Fairfax County, Virginia.

5. Defendant Park Hotels was at all relevant times a subsidiary of Hilton Worldwide.

6. Defendant Hilton International Franchise LLC ("HIF LLC") is a Delaware limited liability corporation with its principal place of business in Virginia.

7. Defendant HIF LLC is and was at all relevant times a subsidiary of Hilton Worldwide.

8. Defendant HIF LLC was at all relevant times a subsidiary of Park Hotels.

9. Defendant Hilton Worldwide Franchising LP ("HWF LP") is a UK limited partnership.

10. Defendant HWF LP is and was at all relevant times a subsidiary of Hilton Worldwide.

11. Defendant HWF LP was at all relevant times a subsidiary of Park Hotels.

12. Defendants Hilton Worldwide., Hilton, Inc., HW, Inc. and Park Hotels may be referred to collectively hereinafter as "Hilton" or "Hilton Defendants."

13. At all times relevant, Defendants acted by and through their employees, agents, and servants, who were acting within the scope of their employment, agency, or master-servant relationship with Defendants.

## FACTS

14. At all times relevant, Seth was a Diamond Elite Hilton Honors customer.

15. Diamond Elite status is Hilton's highest honors level.

16. Whenever Seth traveled, he tried to stay at Hilton resorts, including during his March 2022 trip to Egypt with friends.

### The Hilton Hurghada Plaza

17. Defendant Hilton Worldwide is Egypt's largest hospitality provider.

18. Hilton Worldwide has over 20 hotels in Egypt.

19. Upon information and belief, Defendant Hilton Worldwide or its predecessor, HHC, granted a license to an Egyptian entity to operate under the Hilton brand name a Hilton Worldwide Resort to be known as the "Hilton Hurghada Plaza."

20. Upon information and belief, Defendant Hilton Worldwide or its predecessor, HHC, authorized Defendant HIF LLC to grant a license to an Egyptian entity to operate under the Hilton brand name a Hilton Worldwide Resort to be known as the "Hilton Hurghada Plaza."

21. The Hilton Hurghada Plaza is located in Hurghada, Egypt.

22. Hilton Hurghada Plaza is one of four Hilton Hotels & Resort properties located in Hurghada, Egypt.

23. The Hilton Hurghada Plaza is a luxury beachfront resort and spa (together with its hotel, pools, spa, health club and all appurtenances, facilities, equipment and fixtures, the property shall be referred to as the "premises" or the "Hilton Hurghada Plaza").

24. The Hilton Defendants at all times relevant owned, licensed leased, operated, managed, and provided various services for a network of hotels, inns, conference centers, timeshare properties and other operations throughout the world.

25. Upon information and belief, the Hilton Defendants utilized a Franchise License Agreement to grant licenses to Hilton resort properties.

26. Upon information and belief, one or more of the Hilton Defendants entered into a Franchise License Agreement with an Egyptian entity with regard to the Hilton Hurghada Plaza (the "Agreement").

27. Upon information and belief, one of more of the Hilton Defendants assigned the Agreement to Defendant Hilton Worldwide Franchising LP.

28. Upon information and belief, the Agreement gives the Hilton Defendants substantial control over the Hilton Hurghada Plaza.

29. Upon information and belief, the Agreement gives the Hilton Defendants substantial control over the Spa at Hilton Hurghada Plaza.

30. Upon information and belief, the Agreement mandates that the Hilton Hurghada Plaza licensee operate under the Hilton brand name as a Hilton "System hotel."

31. Upon information and belief, the Agreement mandates that the Hilton Hurghada Plaza licensee operate the premises pursuant to Hilton's "Manual."

32. Upon information and belief, Hilton's Manual contains Hilton written standards and requirements in connection with the construction, maintenance, and operation of every aspect of the hotel and premises, including the Health Spa located on the premises.

33. The licensee is required under the Agreement to adopt, use and comply with Hilton's standards, requirements and specifications regarding the premises, including the training of personnel.

34. Hilton Hotels Brand Standards-Global contain a section dedicated to "SPA" and according to it there is a "Hilton Worldwide Spa Team" responsible for ensuring that System Hotels meet all of the Hilton Spa Standards set forth in the Hilton Brand Standards – Global.

35. The aforementioned Spa Standards dictate that Hilton Worldwide approve everything from Design and Construction to Treatment Offerings.

36. These standards state that "[a]ll treatments must be approved by the Hilton Worldwide Spa Concepts Team.*"*

37. These standards dictate spa safety rules.

38. These standards include the requirement imposed by Hilton upon the licensee that the "International Spa Association (ISPA) Code of Conduct must be followed."

39. These standards include the requirement imposed by Hilton upon the licensee that "the spa must adhere to all Corporate Risk Management guidance." *Hilton Hotels Brand Standards-Global* §§ 1304.01-1306.

40. Pursuant to the Agreement, Hilton has the right to refuse to approve the hiring or retention of Hilton Hurghada Plaza management personnel.

41. Pursuant to the Agreement, Hilton has the right to require the licensee at any time to upgrade the Hilton Hurghada Plaza premises to meet Hilton's then-current standards and specifications.

42. At all times relevant, the Hilton Hurghada Plaza licensee held itself out as an agent of Defendants.

43. At all times relevant, the Hilton Hurghada Plaza licensee acted under Defendants' apparent authority.

44. Defendants advertised the Hilton Hurghada Plaza as a "Hilton Worldwide Resort" throughout the world, specifically including in McLean, Virginia, the Americas, Europe, the Middle East, Africa, Asia and Australia.

5

45. Hilton's website, www.hilton.com, advertises the Hilton Hurghada Plaza as a "beachfront base" with a fitness center, a choice of outdoor pools, and a spa featuring a Turkish bath." http://hilton.com/en/hotels/hrghitw-hilton-hurghada-plaza/

46. Seth booked his stay at Hilton Herghada Plaza through the Hilton.com website.

47. The Hilton.com website did not inform Seth that the Hilton Hurghada Plaza was owned or operated by any entity other than Hilton Worldwide.

48. After Seth booked his reservation at the Hilton Hurghada Plaza, the Hilton Hurghada Plaza Guest Relation person, Elizabeta Vinogradova, emailed him from a Hilton.com email address.

49. Ms. Vinogradova's email signature contained her Hilton.com email address, the name "Hilton Hurghada Plaza," her title – "Guest Relation-Front Office," the Hilton.com web address, the Hilton logo, and links to Hilton's Facebook, Twitter, and Instagram pages.

50. Ms. Vinogradova's email acknowledged that Seth was a Hilton Diamond Honor member and informed him about the personal benefits he would enjoy at the Hilton Herghada Plaza as a result of such Hilton Honors status.

51. Prior to his arrival at the premises, Ms. Vinogradova also emailed to Seth on Hilton logo letterhead a document entitled "Bed and Breakfast Formula."

52. The Bed and Breakfast document on Hilton letterhead listed the Spa as an additional service provided by Hilton.

53. During Seth's stay at the premises, the Hilton Herghada Plaza held itself out as an agent of Hilton Worldwide.

54. The building contained the Hilton logo displayed prominently at the top of the façade.

55. The employees all appeared to be Hilton employees and wore similar outfits.

6

56. The Hilton website showed the Spa at the Hilton Herghada Plaza as being part of the Hilton hotel on the premises.

### The Spa at Hilton Hurghada Plaza

57. With respect to its "**Spa at Hilton Hurghada Plaza**," Hilton's website states: "Overlooking the crystal clear waters of the Red Sea, 'Spa at Hurghada Plaza' offers a tranquil retreat…."

58. With respect to its "**Spa at Hilton Hurghada Plaza**," Hilton's website also states: "**Our highly trained staff** offer an extensive selection of treatments including massage therapy, facials, body scrubs, wraps and more," and that "**Our professional staff** are dedicated to providing the highest level of service…" https://hilton.com/en/hotels/hrghitw-hilton-hurghada-plaza/ (emphasis added).

### Hilton Staff Promoted the Spa at Hilton Hurghada Plaza to Hilton Guests

59. While Seth was at the Hilton private beach at the premises, a person who appeared to be a Hilton employee, approached the beachgoers, including Seth, to promote the services at the hotel.

60. One of the services promoted was the Spa.

61. To Seth it appeared to be and had been represented to be part of Hilton Worldwide.

62. In response to the promotion by the Hilton person at the beach, Seth signed up for a massage at the Spa.

### The Incident

63. On March 18, 2022, Seth, went to the Spa at Hilton Hurghada Plaza for his scheduled massage.

7

64. Before the massage commenced, Seth was standing with his back to the Spa attendant/massage therapist (the "subject Spa attendant and/or massage therapist").

65. Without warning, the subject Spa attendant and/or massage therapist approached Seth from behind, put him in a full-Nelson-like wrestling hold, and aggressively cracked Seth's back.

66. This violent action produced a loud cracking sound and resulted in Seth becoming paralyzed.

67. The subject Spa attendant and/or massage therapist first sat and then laid Seth down. At this time, Seth could still wiggle his toes but could not move his legs and feet and he was having trouble moving his arms and hands.

68. Additional Hilton personnel came to the Spa to see Seth.

69. The Hilton personnel, tried to get Seth to stand up, but he could not, and she and they then moved him around the spa.

70. Hilton personnel treated Seth as if he was faking his paralysis, refused to call for an ambulance, despite his repeated pleas, and allowed Seth to lie in the Spa for a prolonged time that seemed like hours.

71. Seth called an orthopedic doctor family member who told him to get to a hospital immediately, but the Hilton personnel, including Hilton's Ms. Vinogradova, who also treated Seth as if he was faking , still refused to call an ambulance.

72. Instead, Hilton personnel lifted Seth into a wheelchair, took him to his room to get his passport and wallet, then to an apartment adjacent to the hotel for a while, then back to the lobby.

73. Thereafter Ms. Vinogradova called a taxi--instead of an ambulance—to finally take him to the hospital.

74. When one of the Hiton personnel lifted him into the taxi, he hit Seth's head on the taxi.

75. By time Seth got to the hospital he could no longer wiggle his toes and his arms and hands were getting worse.

76. The hospital would not get Seth out of the taxi until he could prove he could pay the hospital with a credit card.

77. At the hospital police arrived, as did numerous Hilton personnel, trying to get Seth to recant the story of what happened, and they were quite hostile.

78. As it became clear that he wasn't going to be treated well at the local hospital, which kept delaying surgery, which Seth got the impression was being blocked by the police, Seth took an ambulance to a Cairo hospital where he had surgery.

79. Thereafter, Seth's family paid to have him life flighted home to Atlanta on or about March 30th-31st.

80. In Atlanta he had surgery to stabilize his spine and spent a significant time in the hospital.

81. Additionally, he has had extensive inpatient and outpatient rehabilitation.

82. Although he has regained some use of his legs and can now use a walker, he still has significant deficits in both his upper and lower extremities.

83. Due to the need for his extensive treatment for paralysis, Seth also had to delay his treatment for cancer that was discovered during treatment for his paralysis.

## COUNT I:  NEGLIGENCE

84. Plaintiff re-alleges and incorporates the preceding paragraphs as if restated herein.

85. Defendants undertook to inspect the Hilton Hurghada Plaza, including the Spa.

86. The inspections were conducted by Defendants' agents and employees at least twice a year.

87. Defendants undertook the duty to ensure that the Hilton Hurghada Plaza complied with Defendant's Spa Standards.

88. Defendants undertook the duty to ensure that the Spa attendants and/or massage therapists at the Spa complied with the International Spa Association's Code of Conduct.

89. Defendants breached their duties of care and were negligent in at least the following ways, without limitation:

    a. By failing to ensure that the Spa employed competent Spa attendants and/or massage therapists;

    b. By failing to properly train its Spa attendants and/or massage therapists, including the subject Spa attendant/massage therapist;

    c. By failing to ensure that the subject Spa attendant and/or massage therapist complied with applicable standards of safety, including but not limited to the International Spa Association Code of Conduct.

    d. By failing to develop and implement a safety plan including, without limitation, a plan for the handling of guests with potential spine injuries.;

90. Defendants owed a non-delegable duty to business invitees at the premises, including Seth, to use ordinary or reasonable care to have the premises in a reasonably safe condition for their invitee's use, and to use ordinary care to hire, train, supervise and retain its Spa attendants and/or massage therapists.

**COUNT II: VICARIOUS LIABILITY FOR NEGLIGENCE OF APPARENT AGENT**

91. Plaintiff re-alleges and incorporates the preceding paragraphs as if restated herein.

92. At all relevant times, the subject Spa attendant and/or massage therapist was an agent or apparent agent of Defendants, and was acting on behalf of Defendants within the scope of his authority as their agent.

93. Defendants permitted and caused the licensee of the Hilton Hurghada Plaza (the "licensee") to hold itself out as Defendants' agent with respect to the Hilton Hurghada Plaza and its Spa, and the licensee, through its employees, servants and agents, appeared to the public to be acting with apparent authority as Defendants' agent.

94. Defendants exercised a considerable degree of control over the licensee and the Hilton Hurghada Plaza , including approving plans and design of the facilities, being involved in the construction of the premises, controlling selection of equipment and fixtures, maintaining approval rights regarding products used at the premises, conducting inspections at least twice a year, maintaining the right to inspect the premises without notice at any time, maintaining the right to order the licensee to undertake particular construction and renovations in accordance with Hilton's standards, mandating compliance with Hilton standards, specifications and requirements (including undertaking to ensure compliance with the International Spa Association Code of Conduct), approving hiring and controlling training of employees (including Spa employees) and requiring the licensee to advertise, market and promote other Hilton properties.

95. Defendants affirmatively advertised and represented to the public, including Seth, that the Hilton Hurghada Plaza, including its Spa, was one of Defendants' Worldwide Resorts.

96. At all relevant times, the licensee acted under the Defendants' apparent authority.

97. Defendants not only acquiesced in the licensee acting as their apparent agent, but created the conditions by way of the Agreement that required the licensee to so act.

98. Because of the acts of Defendants, the licensee and its staff reasonably appeared to Seth, and would reasonably appear to other third parties, to be Defendants' agents.

11

99. Defendants are vicariously liable for the negligence of their apparent agents, the licensee and the subject Spa attendant or massage therapist.

100. Defendants represented to Seth and the public that they operated and controlled the Hilton Hurghada Plaza and its Spa through their agents, and Seth justifiably relied upon the skill and care of such agents.

101. Seth relied upon Defendants' representations from the time they booked the stay at the Hilton Hurghada Plaza until the incident.

102. As a direct and proximate result of the subject Spa attendant's or massage therapist's negligence, for which Defendants are vicariously liable, Seth suffered paralysis and was otherwise catastrophically injured.

103. **WHEREFORE**, Plaintiff prays for judgment and an award of execution against all Defendants, jointly and severally, in the sum of TWENTY- FIVE MILLION AND 00/100 ($25,000,000.00), plus costs of this suit, all applicable interest, and such other and further relief as this Court deems just and proper.

TRIAL BY JURY IS DEMANDED.

                                      Respectfully submitted,

                                      /s/ Christopher P. Yakubisin, Esq._____
Michael G. Phelan, Esq. (VSB No. 29725)
Christopher P. Yakubisin, Esq. (VSB No. 91186)
PHELAN PETTY, PLC.
3315 West Broad Street
Richmond, VA 23230
804-980-7100 – Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty.com
cyakubisin@phelanpetty.com

Trent B. Speckhals, Esq. (GA Bar No. 670515)
SPECKHALS LAW, P.C.
5555 Glenridge Connector, Suite 200
Atlanta, GA 30342

        770-457-9222 – Telephone
        770-458-5456 – Facsimile
        trent@specklaw.com
        *Pro hac vice* application pending

*Counsel for Plaintiffs*