**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **AARON SETH TURNBOW** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:23-cv-1154** |
| ) | |
| **HILTON WORLDWIDE HOLDINGS,** ) | |
| **INC., et al.** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Hilton Worldwide Holdings, Inc. and Hilton International LLC ("Defendants"), by and through undersigned counsel, and hereby submit this memorandum of law in support of their motion for summary judgment. Plaintiff has failed to establish that Defendants owned or operated the spa at issue, or that any actions of the spa employee proximately caused Plaintiff's injury.

## I.  FACTUAL ALLEGATIONS

This action stems from a personal injury claim that occurred in Egypt. It is generally alleged that Plaintiff Aaron Seth Turnbow ("Plaintiff") sustained injury in the spa located at the Hilton Hurghada Plaza hotel in Egypt ("the Hotel").

Specifically, it is alleged Plaintiff traveled to Egypt in March 2022 for a vacation, and elected to stay at the Hotel. (See First Amended Complaint at ¶ 60) It is further alleged that during his stay, Plaintiff elected to sign up for a session at the spa, located in the Hotel. (Id.) Finally, it is alleged that on March 18, 2022, an employee of the spa cracked Plaintiff's neck,

which resulted in paralysis.  (Id. at ¶¶ 62-65).  Plaintiff files suit for negligence and vicarious liability.

Plaintiff filed suit against Hilton International LLC, the entity which operates and manages the Hotel.  Plaintiff also erroneously filed suit against Hilton Worldwide Holdings, Inc., which is the parent company of the parent company of Hilton International LLC and neither owns, operates, manages nor controls the Hotel.

The spa in the Hotel is called "La Perla."  Although it is located inside the Hotel, it is neither owned nor operated by the Hotel or the Defendants.  The spa is owned by a third-party company called La Perla Co. pursuant to a Lease Contract.[3]  (See Lease Contract (Ex. A))  All employees of the spa, including the gentleman who allegedly touched Plaintiff, are employed by La Perla Co.  It is La Perla Co.'s responsibility to hire and train its employees, to ensure that its employees have the appropriate licenses, and to terminate its employees when necessary.  (Id.)

Furthermore, medical records produced in discovery revealed critical information pertaining to Plaintiff's medical condition.  Upon arrival at a hospital in Egypt, shortly after the alleged incident, it was discovered that Plaintiff had cancerous tumors in his spine.  Plaintiff's treating neurosurgeon in Egypt, Dr. Darwish Jaber, stated that Plaintiff's MRI revealed the presence of a tumor and erosion in the vertebra, the cause of the injury is due to complications from that tumor, which led to the erosion of the vertebra, causing compression of the spinal cord with any slight movement.  When asked about whether a massage technique can cause the type of injury shown in Plaintiff's scans, Dr. Jaber responded in the negative.  Dr. Jaber further stated that the massage session or cracking of the vertebra does not cause fracture or erosion to the degree visible on the patient's x-ray, and this injury can occur to him from any slight movement

---

[3] The Lease Contract was drafted by the owner of the Hotel, and erroneously refers to the Hotel management company as "Hilton Management Company."  This is either a misnomer, or an error in translation.  It is stipulated by the Parties that the management company of the hotel is Defendant Hilton International LLC.

as a result of the presence of a tumor around the seventh vertebra that caused the erosion of that vertebra.  (See Statement of Dr. Jaber (Ex. B)).

Subsequently, Plaintiff returned to the United States and treated at Emory University Hospital.  The medical records revealed that during his stay at Emory, Plaintiff treated with, among other medical providers, neurosurgeon Gerald E. Rodts, M.D. ("Dr. Rodts').  The medical records produced from Emory University Hospital and Dr. Rodts confirmed that Plaintiff's spinal fracture was pathologic in nature—caused by cancer.  (See Emory University Hospital medical records "EU291-294" (Ex. C); See also Emory University Hospital operative report "EU335-338" (Ex. D))  Defendants retained the expert services of neurosurgeon Dr. Dennis Rivet, who agreed with the conclusions of Dr. Jaber, as well as those stated in the Emory University Hospital medical records.  (See Dr. Rivet report and curriculum vitae (Ex. E); Dr. Rivet deposition (Ex. F)

## II.    <u>STANDARD OF REVIEW</u>

"Pursuant to Fed. R. Civ. P. 56(c), judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderso*n, 477 U.S. at 250 (1986).

When ruling on a Motion for Summary Judgment, the court must construe the facts in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party

who bears the burden of proof on a particular claim must factually support each element of his or her claim.  A complete failure of proof concerning an essential element…necessarily renders all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 323 (1986).  On those issues where the nonmoving party has the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderso*n, 477 U.S. at 256 (1986).  Furthermore, "a mere scintilla of evidence is not enough to create a fact issue." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984).  There must be sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderso*n, 477 U.S. at 249-50 (1986).

### III.   <u>ARGUMENT</u>

#### A.  Egyptian Law

The First Amended Complaint was filed in this Court pursuant to 28 U.S.C. § 1332— diversity of citizenship and amount in controversy.  When determining whose substantive law applies to diversity claims, a district court applies the conflict of law rules of the state in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  Since this Court is located in Virginia, Virginia's conflict of law rules apply.  Under Virginia law, "questions of substantive law are governed by the law of the place of the transaction or the place where the right is acquired (*lex loci*)…" *Spring v. United States*, 833 F. Supp. 575 (E.D. Va. 1993)(quoting *Frye v. Commonwealth*, 231 Va. 370, 376, (1986)).  *Lexi loci delicti* dictates that when an accident occurs in another state, substantive rights of the parties…..are to be determined by the law of the state in which the alleged tort took place.  *See Baker v. Booz Allen Hamilton*, 358 F. App'x 476, 480-81 (4th Cir. Dec. 28, 2009) (finding that Kyrgyz law applied to a negligence

claim arising out of an alleged sexual assault that occurred in Kyrgyzstan). Here, the alleged tort occurred in Egypt. Therefore, under Virginia's *lex loci* rule, Egyptian law would apply to this action.

Pursuant to the attached affidavit from Egyptian attorney Tarek Ezzo, the Egyptian Civil Code no. 131, year 1948, is the law that governs the provisions of both tort liability and vicarious liability. (See affidavit of Tarek Ezzo and associated exhibits (Ex. G)

According to Mr. Ezzo, in Egypt, despite the non-existence of an established system of legally (*de jure*) binding precedents, previous judicial decisions do have persuasive authority. Courts are morally and practically bound (*de facto* binding effect) by the rules, principles and precedents of Court of Cassation for civil and commercial litigation. In other words, if there is a rule which is established by the Court of Cassation, First Instance Courts and Appeal Courts are morally and practically bound to follow. (Id.)

In addition, there are many academic textbooks in Egypt that are very well known, and usually Egyptian Courts refer to some of these textbooks for interpretation, commentary, and for giving similar examples. According to Mr. Ezzo, the most well-known textbook is "Al-Wasit" of Dr. Abd El-Razzak El-Sanhuri (referred to hereinafter as "Al-Wasit"). Dr. Abd El-Razzak El-Sanhuri was an Egyptian jurist, law professor, judge and politician. He is best remembered as the primary author of the revised Egyptian Civil Code of 1948. Al-Sanhuri's multi-volume masterwork "Al-Wasit", a comprehensive commentary on the Egyptian Civil Code of 1948, and on civil law more generally, is highly regarded in legal and juristic professions. Mr. Ezzo refers to Dr. El-Sanhuri text book and clarifications given in relation to tort liability and vicarious liability. (Id.)

### i. Liability in Tort Under Egyptian Law

Article (163) provides that: "*Every fault which causes damage to another, gives rise to the liability in damages of the person who has committed it.*"  The above article is the general provision that defines the liability in tort under the Civil Code.  In applying the provisions of the said article, a Plaintiff has an obligation to prove: (1) the failure/fault of the Defendant, (2) damages suffered by Plaintiff and, (3) the casual link between failure/fault and damage and that the Defendants fault has proximately caused and resulted in the injury.  In order to apply article (163), which defines the tort liability, Plaintiff must prove the fault/failure (Defendant and/or his subordinates act or negligence or reckless conduct), damage (the injuries suffered by Plaintiff) and the casual link between failure and damage (Defendant and/or his subordinate's act or negligence or reckless conduct was the proximate cause of Plaintiff's injuries).  (Id.)

Dr. El-Sanhuri has explained the liability in tort in Page 775 of Part 1 of his textbook Al-Wasit.  He provided that:

> "523 - Liability is established based on fault that has to be proved: The liability for personal actions. Personal action committed by the liable person himself, it's a liability established based on a fault that has to be proven.  The fault here is not assumptive, but rather has to be proven by the creditor on the side of the debtor. And this is the general rule of the liability in tort, the law did not exempt from this rule except in certain conditions limited by provisions which turns the liability to be based on assumptive fault."

(Id. at Exhibit 2)

### ii. Proximate Cause Under Egyptian Law

According to Egyptian law and doctrine, a defendant cannot not be held liable for negligence if the alleged improper action did not proximately and/or directly cause the injury. Dr. El-Sanhuri also explained the differences between direct and indirect damages/losses in Page 915 of Part 1 of his textbook Al-Wasit,  He provided that:

"[I]t is observed from the aforementioned that the direct damages, the damages which normally resulted from the committed fault and the damaged person can not prevent by making reasonable efforts, solely maintain linkage relation between the itself and the fault from the legal aspect.  However, the indirect damages, which normally do not result from the fault that caused the damages, interrupts linkage between itself and the fault, and the Defendant will not be liable for it."

(Id. at Exhibit 3)

### iii. Vicarious Liability Under Egyptian Law

In terms of various liability, article (174) provides that:

"(1) The master shall be responsible for the illicit act by his/her subordinate as long as it is committed while or due to performing his/her job. (2) Subordination materializes even if the master is not liberate to choose his/her subordinate as long as he/she has an actually authority supervising and instructing his/her subordinate."

According to Mr. Ezzo, it is essential that in order to establish the fault factor of the Defendant, that a Master-Subordinate direct relation should exist between the Defendant and the massage therapist, the massage therapist is dependent to the Defendant, and the Defendant must have an actual authority in controlling and guiding the massage therapist.  Otherwise the fault factor will not be established. (Id.)

Dr. Al-Sanhuri has explained Master-Subordinate relation and its conditions in Page 1014~1015 and Page 1023 of Part 1 of his textbook Al-Wasit.  He provided that:

The Master's liability for the acts of his subordinates is established in the presence of TWO main elements: First: The Master Subordinate relation (Relation of dependence) and Second: The subordinate fault while performing or as a result of his job.  He also added that the first main element (Master Subordinate Relation) has two conditions, (1) The actual authority element, and (2) Controlling and guidance element; and he further added that also the Second main element (The subordinate fault while performing or as a result of his job) has two conditions, (1) The subordinate commits a fault that harms others and (2) This fault is committed during the performance or as a result of the subordinate's job.

(Id. at Exhibit 4)

Court of Cassation in appeal no. 14369 judicial year of 84 ruled that:

> Rule 1 - It is agreed by the rulings of this court that the subordinate master relation is based on the existence of guardianship in controlling and guiding, that the master has an actual authority in giving orders to the subordinate in the performance of his job, supervising him in executing these orders and penalize him for not following them, the base of the master subordinate relation is the actual authority the first has on the second in respect of the administrative and organizational aspect.

(Id.)

Per Mr. Ezzo and this explanation given by Dr. El-Sanhuri, if Plaintiff will rely on the provisions of vicarious liability as his basis for a negligence claim, then Plaintiff will have the burden to prove that the massage therapist is considered a subordinate to Defendant and not the spa. (Id.)

## B.  Defendants Do Not Own Nor Operate the Spa, and Do Not Control Its Employees

The sole act of alleged actual negligence in this case was purportedly committed an employee working at the spa.  As described above, The First Amended Complaint alleges that an employee of the spa cracked Plaintiff's neck, which resulted in paralysis.  (Id. at ¶¶ 62-65). Plaintiff confirmed this description in his deposition, except he clarified that the spa employee's actions occurred in the sauna—prior to the massage session.  (Plaintiff Tr. (Ex. H) at 78:11-79:3) Consequently, in order to establish negligence, Plaintiff bears the burden to prove that Defendants exerted control over this spa employee—as defined by Egypt law.

The spa in the Hotel is called "La Perla."  Although it is located inside the Hotel, it is neither owned nor operated by the Hotel owned or the Defendants.  The spa is owned by a third-party company called La Perla Co.  It is situated inside the Hotel pursuant to a Lease Contract with the ownership entity of the Hotel—Arab Investment Company.  (Ex. A)  All signage for the spa states exclusively "La Perla" or "La Perla Spa and Beauty." (See Photos of La Perla spa signage.  (Ex. I))   All invoices for the spa, including Plaintiff's invoices, state exclusively "La

Perla Spa and Beauty." (See Plaintiff's spa invoices (Ex. J)) The spa menu, which outlines the different massages and services available at the spa, states exclusively "La Perla Spa and Beauty." (See spa menu (Ex. K)) All incoming spa clients, including Plaintiff, are required to fill out a medical questionnaire. The letterhead on this questionnaire state exclusively "La Perla Spa and Beauty." (See Plaintiff's medical questionnaire (Ex. L)) None of these items state "Hilton" or "Hilton International."

To the contrary, Plaintiff's invoice from the Hotel is devoid of any mentioning of the La Perla spa. (See Plaintiff's Hotel invoice (Ex. M)) In fact, Defendants' corporate designee—former general manager of the Hotel Medhat Samir Wassef—testified that a guest cannot bill spa services to his room or to the Hotel. (See Hilton corporate designee Tr. (Ex. N) at 128:5-11; 130:25-131:20, 135:5-12) La Perla Co. is a completely separate entity.

Plaintiff testified that made the decision to use the spa after a gentleman approached him on the beach, offering spa services. (Ex. H at 61:1-62:2) Mr. Wassef testified that it could not have been a Hilton employee who approached Plaintiff. Hilton employees were not authorized to make spa appointments for guests, nor to even hand out literature for spa services to guests. (Ex. N at 163:25-164:15) The only persons who went out to the beach to solicit spa services from guests were La Perla Co. employees. (Id. at 168:12-22) This is the arrangement established by the Lease Contract, which precludes La Perla Co. from using Hilton's name, either in the conduct of its services or in advertising or marketing. (Ex. N at § 8.16)

Mr. Wassef has worked as a manager for numerous Hilton hotels in Egypt for over twenty-six years. (Id. at 8:17-23; 8:24-26:7) He explained that while some Hilton hotels manage the spas internally, others utilize an independent third party contractor. In fact, prior to 2016, the spa at the Hotel was managed by a Hilton entity. (Id. at 90:20-21)

However, ever since re-opening after a renovation in 2019, the Hotel has been operated exclusively by a third-party contractor—La Perla Co.  (See Ex. A; See also Ex. N at 40:7-19; 119:3-24)  Pursuant to the Lease Contract, all employees of the spa, including the gentleman who allegedly touched Plaintiff, are employed by La Perla Co.  (See Ex. A at §§ 8.11, 8.27)  It is La Perla Co.'s responsibility to hire and train its employees, and to ensure that its employees have the appropriate licenses.  (Id.)  In fact, Mr. Wassef confirmed that it is not Defendants' job to ensure that the spa employees have the appropriate licenses before giving a massage.  That responsibility falls squarely with La Perla Co.  (Ex. N at 142:5-15)

It is anticipated that Plaintiff will attempt to argue that notwithstanding the aforementioned contract terms and sworn testimony, that Defendants still somehow maintain control over the spa.  At deposition, Plaintiff brought up the fact that La Perla Co. is required to comply with Hilton brand standards.  But Mr. Wassef clarified that this "compliance" was limited to physical appearance, cleanliness, and service standards.  (Id. at 132:31-133:8; 134:4-14)  "Service standards" concerns how the spa staff respectfully treats the Hotel's guests, not how to perform the actual massage and/or sauna services.  (Id. at 139:6-22)  Next, Plaintiff brought up how §8.12 of the Lease Contract allows for Hilton, in general, to request that a spa employee be replaced.  Again, however, Mr. Wassef clarified that although the Hotel can request that a spa employee be replaced with another spa employee, it does not have the power to reprimand or terminate any spa employee.  (Id. at 106:15-107:14)  Defendants never had any control over the spa employee.  As such, these anticipated issues referenced at the deposition are merely red herrings.  The fact remains that the spa employee is the only person who is alleged to have committed any wrongdoing, and that employee was employed, trained, paid, and controlled exclusively by La Perla Co.—a completely independent entity.

In order to sustain a negligence claim under Egyptian law, Plaintiff is required to prove negligent conduct on the part of a defendant's subordinates.  (Id)  Actual authority is required to be established.  Here, the spa employee at issue was not under the control of Defendants at the time of the alleged incident.  When applying both the above-referenced Egyptian law and the Lease Contract terms to the instant matter, the fault factor that resulted in the incident has not been caused by the Hotel or its subordinates.  The alleged fault has resulted from one of the spa employees for whom La Perla Co. is fully responsible pursuant to §§ 8.25 and 8.26 of the Lease Contract.

In light of the above, Mr. Ezzo concluded that if such case is brought before an Egyptian Court, Defendants would not be held liable based on Tort Liability considering that: (1) the alleged fault has resulted from one of the spa employees who is not dependent to the Hotel.  (Ex. G)  Given Plaintiff's failure to establish Defendants' control over the spa employee, as defined by Egyptian law, summary judgment should be granted.  Therefore, Defendants Plaintiff's negligence claim fails as a matter of law.

For the same reason, Plaintiff's claim for vicarious liability also fails as a matter of law. As outlined above, the undisputed record evidence establishes conclusively that the spa employee was employed solely by La Perla Co.  As set forth above, a requisite element of vicarious liability under Egyptian law is the establishment of subordinate-master relationship. (Ex. G)   This relationship is based on the existence of guardianship in controlling and guiding, that the master has an actual authority in giving orders to the subordinate in the performance of his job, supervising him in executing these orders, and penalizing him for not following them. Defendants have no such control over the spa employee.  The absence of a master-subordinate relationship is fatal to Plaintiff's claim.

### C.  The Actions At the Spa Did Not Proximately Cause Plaintiff's Injury

Even if the spa employee did work for Defendants—which he did not—his actions did not proximately cause Plaintiff's injury.  The First Amended Complaint would have it appear that Plaintiff was a perfectly healthy individual, who suddenly found himself paralyzed after his interaction with the La Perla employee.  But the medical and expert evidence produced in discovery revealed that this was not the case at all.

In the months prior to his trip to Egypt, Plaintiff treated with a chiropractor at North Decator Health Care.  (See North Decator records (Ex. O))  In April 2021, Plaintiff initially sought treatment at this facility for stiffness in his neck and numbness in his right hand.  (Id. at p. 1)  Plaintiff clarified at deposition that the numbness was actually not limited to his land, but also included his arm.  (Ex. H at 31:23-32:2)  On December 13, 2021, Plaintiff returned to North Decator, this time with complaints of frequent sharp pain, stiffness, tightness, and aching in the neck, upper back and arm.  (Ex. O at p. 3)  These problems and treatment continued through January and February of 2022.  (Id. at pp. 4-9).  On March 8, 2022—the day before he left for Egypt—Plaintiff treated yet again at North Decator for frequent sharp tingling, pain, stiffness, soreness, and aching of the neck, shoulder, upper back, mid and lower back. (Id. at p.10)  Plaintiff was prescribed a steroid at this appointment.  (Id.)  Notwithstanding experiencing these persistent problems for nearly a year, prior to traveling to Egypt, Plaintiff never sought treatment with any medical provider other than a chiropractor.  (Ex. H at 43:10-14; 76:17-23)

While in Egypt, Plaintiff's medical problems did not stop.  To the contrary, they continued up through Plaintiff's interaction with the spa employee.  In fact, during the Egypt trip, Plaintiff finally made the decision to seek treatment with a medical professional for his ongoing pain.  While on his Egypt trip, but before going to the spa, Plaintiff made an appointment with a

primary care physician—Dr. Danielle Glaeser.  (Id. at 127:2-129:20)  When asked why he made this new appointment <u>during</u> his Egypt trip, Plaintiff responded as follows:

> Q Why did you make an appointment?
>
> A Well, after I took the steroids and we were talking around and I realized, you know, in working with this shoulder for a time period that it wasn't getting any better and I needed to really seek professional -- like a doctor, you know, and make sure what's wrong. And that's when I made that appointment.

(Id. at 128:25-129:7)

Plaintiff testified that the reason that he made the spa appointment is that he was still feeling discomfort in that same area of his body.  (Id. at 62:25-63:9)  Indeed, when he entered the La Perla spa, Plaintiff filled out a medical questionnaire.  (Ex. L)  In this questionnaire, Plaintiff conceded that he was currently suffering from back or joint problems.  (Id.)  This questionnaire further stated that if he answered "yes" to any of the questions, that he should seek medical advice prior to utilizing the sauna.  (Id.)  Despite just having recently made a medical appointment because he was in ongoing pain, Plaintiff did not seek medical advice prior to using the sauna.  (Ex. H at 77:11-78:2)  Finally, after initially entering the sauna, Plaintiff then had to exit shortly thereafter because he was in pain.  Plaintiff went back to his locker to retrieve some ibuprofen, and advised the spa employee that he was in pain.  (Id. at 78:11-22)  Thus, for nearly a year up until the moment of his interaction with the spa employee, Plaintiff was suffering from pain and problems with his spinal area.

Upon arrival at the Red Sea Hospital in Egypt later that day, the mystery of Plaintiff's spinal problems was finally solved.  Plaintiff had cancerous tumors in his spine.

The day after the alleged incident, Plaintiff's treating neurosurgeon in Egypt—Dr. Darwish Jaber—gave a statement to prosecutors regarding Plaintiff's medical condition.[4]  (Ex. B)  Dr. Jaber advised that Plaintiff's MRI revealed the presence of a tumor and erosion in the vertebra.  (Id.)  Dr. Jaber further stated that the cause of the injury is due to complications from that tumor, which led to the erosion of the vertebra, causing compression of the spinal cord with any slight movement.  (Id.)  When asked about whether a massage technique can cause the type of injury shown in Plaintiff's scans, Dr. Jaber responded in the negative.  (Id.)  Dr. Jaber explained that the massage session or cracking of the vertebra does not cause fracture or erosion to the degree visible on the patient's x-ray, and this injury can occur to him from any slight movement as a result of the presence of a tumor around the seventh vertebra that caused the erosion of that vertebra.  (Id.)

Following initial treatment and surgery in Egypt, Plaintiff returned home and continued treatment at Emory University Hospital in Atlanta, Georgia.  The medical records revealed that during his stay Emory, Plaintiff treated with neurosurgeon Gerald E. Rodts, M.D. ("Dr. Rodts').  The medical records produced from Emory University Hospital and Dr. Rodts confirmed that Plaintiff's spinal fracture was pathologic in nature.  (Ex. C and D)  Specifically, Dr. Rodts diagnosed Plaintiff with a "pathological fracture with circumferential cord compression of the cervical thoracic junction" and "Posterior spinal cord compression and spinal stenosis of C6-C7 from metastatic tumor."  (See Ex. C at "EU293" and Ex. D at "EU335")  In other words, the fracture was caused by cancer.

After the instant lawsuit was filed, Defendants retained the expert services of neurosurgeon Dr. Dennis Rivet, who reviewed all medical records and all statements rendered by

---

[4] Based on the initial allegation of wrongdoing, a criminal investigation was opened in Egypt against the spa employee.  However, upon completion of the investigation, no charges were filed.

all of Plaintiff's treating physicians.  Dr. Rivet agreed with the conclusions of Dr. Jaber, as well

as those stated by Dr. Rodts in the Emory University Hospital medical records.  (Ex. E and F)  In

his Rule 26(a)(2) report, Dr. Rivet concluded the following:

1.  [Plaintiff] developed an acute neurological deficit due to spinal cord compression
    resulting from a pathologic fracture of the C7 vertebral body.  This fracture
    occurred due to erosion of and replacement by a metastatic lung adenocarcinoma.
    [Plaintiff] had multiple well-documented antecedent symptoms of neck pain, arm
    pain and hand numbness beginning months prior to his acute neurologic deficits
    developing.  The neck pain and cervical radiculopathy were caused by the tumor
    encroaching on the spinal cord and nerve roots of the cervical region.

2.  The plaintiff's clinical presentation is entirely consistent with the etiology and
    mechanism of a pathologic fracture causing spinal cord compression.  It is
    frequent for a pathologic fracture to occur without any traumatic mechanism,
    rather they occur under normal physiological function.  The described imaging
    appearance of the tumor in the spinal column, both in the vertebral body, the
    posterior structures of the spine, and the adjacent tissues of the neck is consistent
    with a malignant neoplastic process, not an acute traumatic injury.  Both of the
    surgeries performed on the patient's spine revealed pathologic evidence of a
    metastatic adenocarcinoma, subsequently confirmed with location and biopsy of a
    lung primary adenocarcinoma, the source of the spinal and other distant
    metastases.

3.  The invasion, destruction and replacement of the cervical spinal bones by the
    tumor caused mechanical instability which led to collapse and structural failure of
    the bony spine.  This process took at least months to occur and the ultimate
    fracture and collapse need not have been elicited by any significant external
    forces, activities, or pathologic mechanism.  The occurrence during a massage of
    the back is just a temporal coincidence, not causative.

(Ex. E)

At deposition, Dr. Rivet confirmed what is stated in his report.  (Ex.)  Specifically, Dr.

Rivet testified that:

Q Do you agree that the full nelson procedure resulted in a fracture of his C7
vertebra?

A No.

Q Why not?

15

A Because what resulted in a, quote, fracture, and that's what I said very early on in the deposition, is pathologic fractures are called fractures but that's not -- it's a bit of a misnomer.  So he didn't have a fracture.  What he had was a complete structural failure.  And when pathological, quote, fractures, close quote, happen, they happen with normal physiologic loads.  Basically the structure of the vertebral body in this case and the rest of the spinal column was gone.  So on CT scan, on x-rays, the mineral content, the structural stability, the intactness of the bone is already lost.  Fractures mean intact bone that has had a biomechanical disconnection or discontinuity occurred.  That's not -- that is not the injury he had.

Q Well, you agree that his C7 vertebra was fractured; correct?

A No.  That's what I'm trying to answer.  So a pathological fracture is distinct from what most people -- what most people on a jury would understand to be a fracture.  A fracture, most people would understand that to be a broken bone.  He doesn't have a broken bone.  He has an absent bone.  He has a bone replaced by a tumor.  That's the semantics of why I'm saying he had an acute event.  I'm trying to differentiate what happened to him from I would say the more common understanding of a fracture.

(Ex. F at 17:13-18-19)

Dr. Rivet disagreed with the proposition that the cracking of Plaintiff's neck is what caused his paralysis.  (Id. at 20:16-21:1)  While he agreed that the "full nelson" by the spa employee, as described by the Plaintiff, was the antecedent event to Plaintiff's paralysis, Dr. Rivet testified that it was not the proximate cause of the fracture or the paralysis.  Based on the presence, size and condition of the tumor, this pathologic fracture was inevitable.  (Id. at 24:20-25:1; 25:18-27:13)

Q And when Seth was in the spa and he walked in under his own power but he had to be wheeled out in a wheelchair, do you believe any person caused him injury?

A …..I understand that's a critical question to the case.  The cause is not a person.  The cause was a tumor.

(Id. at 24:10-18)

Finally, at deposition, Dr. Rodts confirmed what is stated in the Emory University Hospital medical records.  Specifically, Dr. Rodts testified that Plaintiff sustained a pathologic

fracture in his cervical spine, and that this pathologic fracture is what caused Plaintiff's paralysis and associated symptoms.  He agreed with Dr. Jaber and Dr. Rivet that Plaintiff had erosion in his seventh cervical vertebrae, that imaging revealed the presence of a tumor in the seventh cervical vertebrae, that the tumor had effectively replaced the bone in Plaintiff's cervical spine, and that the spinal erosion was not caused by any action at the spa.  Rather, it was caused by cancer.  Although Dr. Rodts placed the timing of the onset of Plaintiff's paralysis at the time of the spa employee's actions, he testified further that Plaintiff's pathologic fracture may have existed prior to the spa session.  In fact, Dr. Rodts conceded that given the condition of Plaintiff's cervical spine at the time, it is possible that Plaintiff could have developed paralysis at some point anyway.  (See Dr. Rodts Tr. (Ex. P) to be produced) [5]  Dr. Rodts did not prepare any rebuttal to Dr. Rivet's report.

As Mr. Ezzo's affidavit articulated above, like here in the United States, under Egyptian law a defendant cannot not be held liable for negligence if the alleged improper action did not proximately and/or directly cause the injury.  (Ex. G)  In light of the above, Mr. Ezzo concluded that if this case were brought before an Egyptian Court, the Court will not hold the Defendants liable based on Tort Liability considering there is no linkage between the fault and damage.

Here, the undisputed medical evidence establishes conclusively that Plaintiff's paralysis was caused by spinal cord compression, which in turn was caused by the presence of a spinal tumor.  Plaintiff's spinal fracture was pathologic in nature, caused by cancer.  Consequently, Plaintiff has failed to establish that the fracture was proximately caused, as defined by Egyptian law, by the actions of the spa employee, as defined by Egyptian law.  Absent the requisite

---

[5] Dr. Rodts was not available for deposition until today—August 19, 2024.  Upon receipt, Defendants will file a Line with the Court to include Dr. Rodts' deposition transcript as Exhibit P to this Memorandum.

element of proximate cause, Plaintiff's negligence and vicarious liability claims fail as a matter of law.

### D.  Hilton Worldwide Holdings, Inc. is An Improper Defendant

Finally, to the extent that the Court is unwilling to dismiss the First Amended Complaint in its entirety, then at the very least, Hilton Worldwide Holdings, Inc. should be dismissed as it is an improper defendant.  Hilton Worldwide Holdings, Inc. is merely the parent company of the parent company of Hilton International LLC and does not own, operate, manager or control the Hotel. It is not a party to the Lease Contract.  (See Ex. A)

As the Court may recall, the original Complaint was filed against four incorrect entities—Hilton Worldwide Holdings, Inc., Park Hotels & Resorts, Inc., Hilton International Franchise LP, and Hilton Worldwide Franchising LP.  (See Complaint)  When discovery began, undersigned counsel explained to Plaintiff that none of the named defendants owned or operated the Hotel. Rather, the correct operating entity of the Hotel is Hilton International LLC.   Indeed, Hilton Worldwide Holdings, Inc.'s discovery responses specifically articulated multiple times:

> Hilton Holdings is the indirect parent company of the Hilton International LLC, the entity which manages the Hilton Hurghada.  Hilton Holdings is not a party to any agreement related to the ownership, operation, or management of the Hotel. Hilton Holdings does not own, operate, or manage the Hotel and does not control or have any involvement in the day-to-day operations of the Hotel.  Hilton Holdings does not employ the personnel working at the Hotel and does not control nor supervise the staff at the Hotel.

(See Hilton Worldwide Holdings, Inc.'s Responses to Plaintiff's 1st and 2nd Sets of Discovery Requests (Ex. Q))

Based on the aforementioned acknowledgment and discovery responses, Plaintiff agreed to amend the Complaint.  Plaintiff prepared a draft Consent Motion to Amend the Complaint, and a proposed First Amended Complaint.  This proposed First Amended Complaint removed Park Hotels & Resorts, Inc., Hilton International Franchise LP, and Hilton Worldwide Franchising LP as

defendants, and replaced them with Hilton International LLC.  However, the proposed First Amended Complaint kept Hilton Worldwide Holdings, Inc. as a defendant.  Undersigned counsel inquired whether once Hilton International LLC was served and filed an Answer, if Plaintiff would then dismiss Hilton Worldwide Holdings, Inc. as well.  Plaintiff's counsel responded in the affirmative.  (See 1/4/24 email (Ex. R))  Accordingly, undersigned consented to the motion, which was filed on January 4, 2024 [ECF 29].  (See Consent Motion to Amend Complaint Ex. S))  The Court granted the motion on January 30, 2024 [ECF 30].  Upon being served, on February 20, 2024, Hilton International LLC filed its Answer to the First Amended Complaint [ECF 37].  In its Answer, Hilton International LLC admitted that it is the manager of the Hotel.  (Id. at ¶ 16)

To date, however, Plaintiff has not dismissed Hilton Worldwide Holdings, Inc.  In addition to the aforementioned discovery responses, Defendants' corporate designee confirmed that Hilton International LLC is the operating entity of the Hotel (Ex. N at 25:2-9)  The designee confirmed further that Hilton Worldwide Holdings, Inc. is merely the parent company of the parent company of Hilton International LLC.  (Id. at 38:1-6; 39:24-40:3)  Discovery is now closed, and Plaintiff has produced no evidence to contradict this point.

Mr. Ezzo's affidavit advised that according to Egyptian law, there is no provision which entitles a claimant to sue a parent company for the actions of a company which are alleged to be responsible for whatever damages claimed.  The principal under Egyptian law is that a company which acquires the juridical personality and has its own financial estate is separate from founders and/or shareholders, and has its own legal capacity.  (Ex. G)

The record is entirely devoid of any evidence that Hilton Worldwide Holdings, Inc. owned, operated, managed, or exerted any control whatsoever over the Hotel, the La Perla Co. spa, or any

La Perla Co. employees.  Therefore, Hilton Worldwide Holdings, Inc. should be dismissed from this action.

WHEREFORE, Defendants respectfully request the Court to enter summary judgment in their favor, dismiss all claims in the First Amended Complaint against them, and any other relief the Court seems to be just.

Respectfully submitted,

KIERNAN TREBACH LLP

*/s/ Michael L. Pivor*_____
Michael L. Pivor, Esq. (75312)
Matthew H. Johnson, Esq. (85094)
1233 20th Street, NW, Suite 800
Washington, DC 20036
(202) 712-7000
(202) 712-7100 (facsimile)
mpivor@kiernantrebach.com
*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of the foregoing was served on this 19th day of

August, 2024 via ECF upon:

Michael G. Phelan, Esq.
Christopher P. Yakubisin, Esq.
Phelan Petty, PLC. 3315
West Broad Street
Richmond, VA 23230
804-980-7100 – Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty
cyakubisin@phelanpetty.com

Trent B. Speckhals, Esq.
Speckhals Law, P.C.
5555 Glenridge Connector, Suite 200
Atlanta, GA 30342
770-457-9222 – Telephone
770-458-5456 – Facsimile
trent@specklaw.com
*Counsel for Plaintiff*

*/s/ Michael L. Pivor_____*
Michael L. Pivor