IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

AARON SETH TURNBOW,

       Plaintiff,

v.                                 Case No.:  **1:23-cv-1154**

HILTON WORLDWIDE HOLDINGS,
INC., et al.

       Defendants.

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    SUMMARY

#### A.  Summary of Law and Argument

Defendants' Memorandum of Law in Support of its Motion for Summary Judgment omits any discussion of Plaintiff's allegations in his First Amended Complaint (FAC) (ECF No.. 29-1) of negligence against Hilton Hurghada Plaza <u>hotel</u> personnel, fails to acknowledge Egyptian law concerning apparent agency, and ignores completely the mountain of evidence that both the Hilton Hurghada Plaza hotel and spa staff were apparent agents of Defendant Hilton International, LLC.  Defendants also fail to disclose facts that contradict many of their alleged "undisputed facts."  Finally, Hilton's Egyptian legal expert, Tarek Ezzo, is a professional witness for hotel and resort chains doing business in Egypt, "maintains remarkable business relations with a variety of prominent international law firms involved in the insurance and marine

industry…enjoys a beneficial relationship with …Kennedys Law,"[1] and states on his website that he personally represents Chubb Group, Hilton's insurer in this case. *See Wilmot v. Marriot Hurghada Management, Inc.*, No. 15-618, 2016 WL 2599092, *3 (D. De. May 5, 2016) (citing Ezzo affidavit in support of Marriot's motion to dismiss for *forum non conveniens*), Affidavit of Terek Ezzo in the instant case (ECF No. 12-1) at ¶ 1.21 and attached *curriculum vitae* at p. 2, Defendants' Initial Disclosures (IV. Insurance Agreements), and https://www.ezzolaw.com/our_clients.php (accessed 8/28/24) (Ezzo's website listing Chubb as a client). In contrast, Plaintiff's Egyptian legal expert, Yousef Samir Elnemr, is a sitting Egyptian Chief Judge who has no ties to any of the parties or law firms in this matter.

Plaintiff's factual allegations concerning the subject incident are set forth in his FAC at ¶s 60-75. Paragraphs 65-71 of the FAC are direct allegations against the Hilton hotel staff, not the spa staff. *Id*. at ¶s 65-71. Plaintiff alleges that, after having his neck violently cracked, he had to be laid down and "could still wiggle his toes but could not move his legs and feet and was having trouble moving his arms and hands." *Id*. at ¶ 64. Defendants' retained medical expert testified that when you have a suspected spinal cord injury, you want to move the injured person as little as possible and keep him flat on his back and immobilized because "once the spinal cord has been injured, further movement can cause further damage." (**Defs' Ex. F** to Memorandum of Law in Support of MFSJ, (ECF No. 49) at pp. 82-83). Plaintiff alleges that "Hilton personnel came to the Spa to see Seth." FAC at ¶ 65, and over the course of hours tried to stand him up, moved him around the spa, treated him as if he was faking, ignored Hilton's staff doctor who

---

[1] Kennedys Law LLP is an international law firm headquartered in London, which, along with local Virginia counsel, represented Hilton in *Michael J. Beste, Administrator for the Estate of Sofia El Khoury Cepeda, Deceased v. Hilton Worldwide Holdings, Inc., et al*., Civil Action No.: 1:117-cv-00748 (AJT/MSN) (U.S.D.C, EDVA 2017).

advised to get Plaintiff to the hospital immediately, refused to call for an ambulance, lifted him into a wheelchair and then wheeled him to his room to get his passport and wallet, wheeled him to an apartment adjacent to the hotel, wheeled him back to the hotel lobby, and then placed him in a taxi, causing him to hit his head getting into the taxi. *Id*. at ¶s 65-71.  By the time Seth got to the hospital, he could no longer wiggle his toes, and his arms and hands were getting worse. *Id*. at ¶72.  Defendants neither address these allegations nor disputes that the Hilton hotel staff were agents of Hilton.

Defendants fail to advise the Court of Egyptian Court of Cessation authority, published decisions, or the writings of eminent Egyptian legal scholars recognizing that Egyptian law follows the apparent authority doctrine.  In his Memorandum in Support of Motion for Summary Judgment at pp. 4-12 (ECF No. 51) and herein, Plaintiff cites a litany of undisputed facts in support of his claim that the Hilton Hurghada Plaza hotel and spa and their employees were the apparent agents of Defendants.

According to the Declaration of Yousef Samir Elnemr, Chief Judge and Head of the 8th Commercial Circuit in North Cairo's Elementary Court, under the facts of this case and Egyptian law, the Hilton defendants can be held liable for the actions of the Hilton hotel and spa personnel for numerous reasons. (**Ex. 1, Declaration of Yousef Samir Elnemr**).  First, Egyptian law provides that Hilton can be liable for the actions of its employees and agents who moved Mr. Turnbow around after he was initially injured, causing his injuries to worsen. (***Id.*** at pp. 2-5).  Second, "Hilton may be liable under the concepts of 'Apparent Agency' or 'Apparent Authority,' and the effects of the 'apparent situation.'" (***Id.*** at p. 5 and pp. 5-9).  Third, the Hilton Defendants can be liable in this case under the concept of "effective cause". (***Id.*** at pp. 9-15).  Due to the temporal cause and effect of Mr. Turnbow walking into the spa, having someone

forcefully and unexpectedly crack his neck, and then immediately suffering paralysis, Chief Judge Elnemr opines that "this alone would defeat [Defendants' causation] argument, without the need for any expert testimony under Egyptian law…." (**Id**. at pp. 9-10).

### B.  Summary of Facts[2]

On March 18, 2022, Mr. Turnbow was a Hilton Diamond Elite Honors guest at a Hilton Worldwide Resort in Hurghada Egypt called the Hilton Hurghada Plaza (the "Hilton Hurghada").  Mr. Turnbow booked his stay at the Hilton Hurghada on Hilton's app, which is accessible through Hilton's website, www.Hilton.com.  The website is owned by Hilton International Holdings LLC.  Defendant Hilton Worldwide Holdings, Inc. is a parent company of Defendant Hilton International LLC and of Hilton International Holdings LLC.

At the time of Mr. Turnbow's stay at the Hilton Hurghada, the resort was owned by Arab Investment Company but was at all times promoted as a Hilton brand property and operated and managed by Defendant Hilton International LLC.  The Hilton Hurghada included, *inter alia*, a large hotel, a spa within the hotel building, restaurants within the hotel building, a Hilton marina and a private Hilton beach on the Red Sea.  On March 18, 2022, Mr. Turnbow and two of his travel companions went to the Hilton Hurghada spa for massages.  The day before, the friends were approached while they were at the private Hilton Hurghada beach by a person whom they believed to be a Hilton employee because this person was **wearing a polo shirt with the Hilton logo on it**. This person solicited the friends to book massages at the Hilton Hurghada spa and produced a written receipt on which the payor had to write in his Hilton room number.  The spa is located off the main lobby of the hotel in the same building as the hotel and is promoted on

---

[2] Citations to all of the Summary Facts are provided in Section III – Plaintiff's Statement of Undisputed Facts.

Hilton's website with references to the spa staff suggesting that said staff are Hilton employees. Mr. Turnbow researched the Hilton Hurghada Spa on the Hilton website prior to booking his stay at the resort.

On the date of the incident, the three companions were separately escorted by an attendant from the front desk of the spa into the sauna area of the spa.  The attendant was not a certified or licensed massage therapist.  Local Egyptian law required massage therapists to be licensed and certified. The attendant's name was Ismail Yassen Muhammed Hussein ("Mr. Yassen").

According to Mr. Turnbow and the two eyewitnesses, Mr. Yassen delivered Mr. Turnbow to the sauna area where the other two companions had already assembled.  There was a conversation between Yassen and Mr. Turnbow about Turnbow having a sore shoulder.  Mr. Yassen went back out to the front of the spa area and returned with some sort of cream or lotion. He approached from behind Mr. Turnbow, applied cream to Turnbow's shoulders and in one quick motion, without warning, proceeded to put Turnbow in a full nelson and aggressively cracked Turnbow's neck, producing a loud cracking noise.  Turnbow immediately suffered paralysis.  After many hours of delay and rough handling by the Hilton Hurghada hotel staff, who refused to call an ambulance, Mr. Turnbow was eventually put in a cab and taken to an Egyptian hospital where he was diagnosed with a fractured cervical spine with paralysis.

Hilton International, LLC operated and managed the entire Hilton Hurghada premises, including the spa, and had the right to control the spa workers.  Hilton drafted the Lease Agreement with La Perla, the spa company.  The Agreement afforded Hilton significant control over La Perla, including the right to force La Perla to replace any spa employee for any reason with two weeks' notice, mandating compliance with Hilton Spa Standards, and mandating

certain training.  Importantly, the spa employees who approached Mr. Turnbow and his friends on the private Hilton beach were wearing Hilton polo shirts on which the Hilton Hotels & Resorts logo was visible.

## II.     STANDARD OF REVIEW

The standard of review for summary judgment is well settled and will not be repeated here.  With respect to the issue of whether Defendants are liable for the acts of their agents and/or apparent agents, the "relevant inquiry" is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that a party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 251-52 (1986). Given the mountain of facts presented below regarding agency and Chief Judge Elnemr's Declaration, this matter should clearly be decided by the trier of facts.

## III.     STATEMENT OF UNDISPUTED MATERIAL FACTS

The facts in this case so strongly support the Plaintiff's claims that he has filed a competing Motion for Summary Judgement [ECF No. 50]. Accordingly, it is appropriate to present the undisputed facts which were omitted from Defendant's Memorandum [ECF No. 49] to show both why Plaintiff's Motion should be granted, and the Defendants' Motion should be denied. Plaintiff is also filing with this Memorandum his Statement of Genuine Issues in Opposition to Defendants Statement of Undisputed Material Facts at [ECF No. 57-1].

### A.     The Hilton Worldwide Network

1.     Defendant Hilton Worldwide Holdings, Inc. is a parent company to Hilton International Holding LLC. (**Ex. 2** Hilton corporate chart produced by Defendant Hilton International as Bates No. 000106) and (**Ex. 3, Def. 30(b)(6) Dep.** Rule 30(b)(6) Dep. Tr. of Defs., 39:24 – 40:2).

6

2.      Hilton International Holding LLC is the owner of the website, www.hilton.com.  (**Ex. 4**.
Hilton International LLC's Answers to Interrogatories, No. 12 at p. 16).

3.      In 2022 it was possible to book a reservation at the Hilton Hurghada through the Hilton
app or the website at www.hilton.com. (**Ex. 4**. Defendant Hilton International LLC's Response
to Requests for Admission, No. 1 at p. 10), and (**Ex. 3, Def. 30(b)(6) Dep., Def. 30(b)(6) Dep.**,
p. 66-67).

4.      Defendant Hilton International LLC produced in discovery a copy of the "Hilton-Hotels-
Brand Standards-Middle East and Africa," ("The Standards Manual"), © Copyright 2018 as
Bates numbers Hilton International 000378-000932. (**Ex. 5** Standards Manual).

5.      The Hilton Standards Manual states that "this Standards Manual ("**Manual)** was
developed to provide the Owner (as defined below) of the Hotel with the required minimum
standards, procedures, rules, regulations, policies, and techniques (the "**Brand Standards**") of
the Hilton ("**Brand**") full-service brand system (the "**System**")." (emphasis in the original).  (**Ex.
5** at Hilton International 000387).

6.      In the Manual, the word "**Owner**" refers to Hilton resort owners operating under a
Management Agreement, a License Agreement or a Franchise Agreement (collectively referred
to in the Manual as the "**Agreement**). (emphasis in the original)[3].  (**Ex. 5** at p. 000387).

7.      According to the Manual, "[a]t or about the time the Owner executes the Agreement, the
Brand will place Owner in a Region set forth below.  The Region that Owner is placed in is
within the sole and absolute discretion of the Brand and may be modified from time to time.
**Owner must comply with the Brand Standards applicable to that Region**, which includes
those Brand Standards that are not limited by Region." (emphasis added) (**Ex 5** at 000387).

---

[3] In this case, the owner operated under a management agreement entitled Operating Agreement.

8.      The entity referred to in the Manual as having the sole discretion is "Hilton Worldwide." (**Ex. 5** at 000387, last ¶).

9.      The Manual contains Section 100 – The Brand Experience.  (**Ex. 5**, § 100).

10.      Section 111.00 entitled "**HILTON HONORS**," mandates that "[t]he property must participate in the Hilton Honors program."  (**Ex. 5**, § 111.00 at p. 000449).

11.      All Hilton Honors Members must receive the same benefits within their honors status regardless of the Hilton Brand resort at which they are staying.  (**Ex. 5,** § 111.05).

12.      Diamond Elite is the highest Hilton Honors membership level.  (**Ex. 3, Def. 30(b)(6) Dep., Def. 30(b)(6) Dep.** at p. 44).

13.      The Manual also contains **Section 503.00-SPA**.  (**Ex. 5**, § 503.00 at pp. 000107-124).

14.      Section 503.00- SPA mandates that the "property must comply with the Hilton Global Design Services approval process prior to commencing spa construction or any renovation of guest-facing areas.  Plans and specifications must also be approved by the Hilton Global Brand Wellness team prior to commencing any work."  (**Ex. 5** at p. 000108).

15.      **The Spa section of the Manual** has a subsection applicable to "**THIRD-PARTY OPERATORS.**"  (**Ex. 5**, § 503.01 at p. 000108).

16.      Section 503.01 states: "If the spa facilities are outsourced to a third-party operator, the **Spa Operator must comply with all physical, cleanliness, and service Standards**. **Compliance is also required with Brand mandated training**.  Third-party facilities are subject to periodic Quality Assurance inspections.  The property is responsible for ensuring compliance. **The Brand will treat non-compliance with Brand Standards by a third-party operator as if the non-compliance were by the Owner**."  (emphasis added). (**Ex. 5** at p. 000108).

17.     Section 503.07 of the Spa section of the Manual states that "Guests must be able to charge spa services and retail purchases to their room folio."  There is no exception stated for spa not integrated into a particular Hilton software system.  (**Ex. 5** at p. 000108).

18.     Section 503.07 further states that: "Spa scheduling and POS software must be approved by the Hilton Spa Concepts Team (spaconcepts@hilton.com)."  (**Ex. 5** at p. 0000108).

19.     The Manual mandates that the Hilton Spa Concepts Team approve all spa treatments. (**Ex. 5**, § 503.08 at p. 000109).

20.     The Spa Section of the Manual contains a subsection entitled, "LICENSE AND CERTIFICATION," which states that "Spa operations must comply with local law and requirements for therapists and spa licensing…. All applicable Team Members must be certified and licensed according to local law. Copies of licenses must be available for review."  (**Ex. 5**, § 503.09 A at p. 000109).

21.     Under a subsection of the Spa Section entitled, "CODE OF CONDUCT,"  the Manual mandates that spa operators at Hilton Brand properties follow the International Spa Association (ISPA) Code of Conduct.  (**Ex. 5**, § 503.09 C at p. 000109).

**B.      Mr. Turnbow's Booking of his stay at the Hilton Hurghada Plaza**

22.     A person can go to www.hilton.com or the Hilton app and find the various worldwide Hilton hotels. (**Ex. 3, Def. 30(b)(6) Dep.,** at p. 81).

23.     On www.hilton.com there is a page for the Hilton Hurghada Plaza.  (**Ex. 3, Def. 30(b)(6) Dep.,** at pp. 81-82).

24.     The Hilton Hurghada Plaza site includes information about the "spa located at the Hilton Hurghada Plaza."  (**Ex. 3, Def. 30(b)(6) Dep.,** at p. 82).

25.     At the top of the web page for the Hilton Hurgada spa is the Hilton Hotels & Resort logo. (**Ex. 3, Def. 30(b)(6) Dep.,** at pp. 82-83).

26.     Mr. Turnbow booked his stay at the Hilton Hurghada Plaza using the Hilton app.  (**Ex. 6, Turnbow Dep.,** Deposition Transcript of Aaron Seth Turnbow at p. 56).

27.     The Hilton web page in www.hilton.com for the Hilton Hurghada Plaza Spa, which was published on-line as of April 1, 2022 is attached as **Ex. 7**.  (*See* Affidavit of Trent Speckhals, Esq. attached as **Ex. 7-1** verifying Ex. 7).  The Hilton website referred to the Spa staff at the Hilton Hurghada Plaza as Our highly trained staff" and "Our professional staff." (**Ex. 7**).

28.     The owner of www.hilton.com, Hilton International Holding, LLC, has full control over the Hilton Hurghada website, including approval of the language on the site.  (**Ex. 3, Def. 30(b)(6) Dep.** at pp. 81-87).

29.     At about the time that Mr. Turnbow accessed the Hilton app prior to his March 2022 trip to book stay at the Hilton Hurghada Plaza, he also researched the resort on the website and saw the same language contained in **Ex. 7** with respect to the Spa staff, i.e., "Our highly trained staff" and "Our professional staff." (**Ex. 8** Declaration of A. Seth Turnbow).

30.     In booking his trip, Mr. Turnbow relied upon the Hilton website description of the Hilton Hurghada spa, beach and pool because the purpose of this stay was to relax after days of trekking all over the desert, the pyramids and the Valley of the Kings. (**Ex. 6, Turnbow Dep..**, pp. 21 and 56, and **Ex. 8).**

31.     Hilton requires all Hilton hotels to provide an Honors welcome to its Hilton Honors Members.  (**Ex. 3, Def. 30(b)(6) Dep.** at pp. 44-45).

32.     Hilton also requires that prior to a Hilton Honors Member's arrival at a Hilton resort, the resort send the member a welcome letter.  (**Ex. 3, Def. 30(b)(6) Dep.** at p. 46).

33.     As such, it was the Hilton Hurghada's customary practice to send such welcome letters. (**Ex. 3, Def. 30(b)(6) Dep.** at p. 53).

34.     After booking his stay at the Hilton Hurghada Plaza Mr. Turnbow received a welcome letter dated March 15, 2022 via email from Elizaveta Vinogradova from email account Elizaveta.vinogradova@hilton.com . (**Ex. 3, Def. 30(b)(6) Dep.** at p. 47).

35.     The Vinogradova welcome email is attached as **Ex. 9**.

36.     Ms. Vinogradova subsequently emailed Mr. Turnbow a document on Hilton letterhead entitled "Bed and Breakfast Formula," which listed an additional food benefit based on Mr. Turnbow's membership status.  (**Ex. 10** Bed and Breakfast Formula).

### C.     The Hilton Hurghada Plaza

37.     The Hilton Hurghada Plaza was owned by Arab Investment Company.  (*See* **Ex. 11** Operating Agreement dated September 20, 1990, **Ex. 12**, Amended Operating Agreement dated October 18, 2010, and **Ex. 13**, Hilton International LLC letter to Arab Investment Company dated March 29, 2017).

38.     According to the Amended Operating Agreement, Defendant Hilton International managed and operated the entire Hilton Hurghada Plaza Extension, defined in Appendix A of the Agreement to include, *inter alia*, the "Massage center."  (**Ex. 12**, at p. 000241, 2nd WHEREAS and Appendix A (Site Plan, p. 2)).

39.     Defendants admit that after the 2010 Amended Operating Agreement, the definition of the Hilton Hurghada Plaza included the Extension, which included the massage center/spa.  (**Ex. 3, Def. 30(b)(6) Dep.**, pp. 70-73).

40.     At the time of Mr. Turnbow's incident, Hilton International LLC was the operator and manager of the Hilton Hurghada Plaza. (**Ex. 4,** Responses to Request for Admissions, No.s 12 and 13).

41.     Hilton employed the hotel people on behalf of the owner, and the employees reported to Hilton. (**Ex. 3, Def. 30(b)(6) Dep.**, pp. 10, 13).

42.     The Amended Operating Agreement required Arab Investment Company to comply strictly with the Hilton Brand Standards, which the Agreement defined to mean "the upscale brand for 'Hilton' hotels and resorts operating under the system elements designated by Hilton or its affiliates, from time to time, to identify hotels and resorts as 'Hilton' hotels and resorts…." (**Ex. 12** at pp. Hilton International 000241 and 246).

43.     When Mr. Turnbow arrived at the Hilton Hurghada Plaza, he saw the giant Hilton Hotels & Resorts logo prominently displayed atop the Hilton Hurghada building, which is depicted in **Ex. 14** (*See* **Ex. 14,** p. 1, Hilton International Bates No. 001041, **Ex. 3, Def. 30(b)(6) Dep.**, p. 54 – Q. "When Mr. Turnbow arrived at the Hilton Hurghada Plaza…this is what he sees on the outside of the building, correct? A. Correct.", and **Ex. 3, Def. 30(b)(6) Dep.,** p. 55 (confirming that the photos show the Hilton Hurghada Plaza with the Hilton logo at the top).

44.     The inside of the Hilton Hurghada Plaza was also adorned with multiple Hilton Hotels & Resorts logos; from the Hilton Honors sign on the front desk (**Ex. 14**, p. 3, Bates 001045, authenticated at **Ex. 3, Def. 30(b)(6) Dep.**, pp. 56-57); to the Check In/Check Out sign (**Ex. 14**, p. 5, Bates 001046, authenticated at **Ex. 3, Def. 30(b)(6) Dep.**, p. 57); to the pens at the Hilton Hurghada Plaza and at  "any Hilton" (**Ex. 14**, p 6, Bates 001038, authenticated at **Ex. 3, Def. 30(b)(6) Dep.**, p. 58); to the Quality Manager's nameplate (**Ex. 14**, p. 8, Bates 001044, authenticated at **Ex. 3, Def. 30(b)(6) Dep.**, p. 59); to the Food Allergy sign posted in the Hilton

main restaurant, which is on the same level as the check-in desk (**Ex. 14**, p. 13, Bates 001039, authenticated at **Ex. 3, Def. 30(b)(6) Dep.**, p. 59-60); to the key card provided to all guests for getting a towel at the pool or beach (**Ex. 14**, p. 15, Bates 001049, authenticated at **Ex. 3, Def. 30(b)(6) Dep.,** pp. 60-61).

45.     All the nametags of Hilton managers at the Hilton Hurghada Plaza would have had the Hilton logo on them with no mention of Hilton Hurghada Plaza.  (**Ex. 3, Def. 30(b)(6) Dep.**, p. 63).

46.     Mr. Turnbow's bill printed at the Hilton Hurghada Plaza was printed on Hilton logo letterhead.  (**Ex. 14**, pp. 16-18 (sic), authenticated as accurately showing the letterhead used to print Mr. Turnbow's bill at **Ex. 3, Def. 30(b)(6) Dep.**, p. 65).

47.     From the time that Mr. Turnbow booked his stay at the Hilton Hurghada Plaza on Hilton app  and viewed www.hilton.com to the time he checked out and received his printed bill, Mr. Turnbow was never informed that the Hilton Hurghada Plaza was owned by Arab Investment Company.  (**Ex. 3, Def. 30(b)(6) Dep.**, pp. 66-67).

48.     Indeed, according to defendants, that lack of disclosure to guests regarding third party ownership is the same for all Hilton hotels worldwide.  (**Ex. 3, Def. 30(b)(6) Dep.**, p. 67).

49.     It is the policy of Hilton at every Hilton hotel not to inform the guests if the hotel is owned by a third party.  (**Ex. 3, Def. 30(b)(6) Dep.**, p. 68).

50.     The spa at the Hilton Hurghada Plaza is located inside the Hilton hotel building.  (**Ex. 3, Def. 30(b)(6) Dep.**, p. 99).

51.     **Exhibit 15**, p. 4, Bates No. Hilton International 000068 shows the corridor located inside the hotel that leads to the spa.  (**Ex. 15**, photo of corridor leading to spa; *see also* **Ex. 3, Def. 30(b)(6) Dep.,** pp. 100-01)  It is on the same level as the check-in desk.

52.     On November 1, 2019, Arab Investment Company and Hilton Hurghada Plaza ("The First Party") entered a Lease Contract with La Perla Co. ("The Second Party") with respect to the Hilton Hurghada Spa.  (**Ex. 16** – Lease Contract).

53.     The Lease Contract is a template drafted by Hilton Legal. (**Ex. 3, Def. 30(b)(6) Dep.** at pp. 101 and 114).

54.     In the Lease Contract, The Lessor/First Party acknowledged that defendant Hilton International, LLC was appointed to operate and manage the Hilton Hurghada Plaza and gave Hilton International "full legal authority to enter into this Lease Contract on Lessor's behalf and to exercise and perform the rights and powers of the Lessor under this Lease Contract."  (**Ex. 16**, p. 2, Article 1-1 and *see* **Ex. 3, Def. 30(b)(6) Dep.**, pp. 102-104 acknowledging that "the HILTON MANAGEMENT COMPANY" referenced in the Lease Contract is Hilton International, LLC).

55.     In the Lease Contract, La Perla Co. acknowledges that "the Hotel is operated as part of a worldwide system of hotels owned, managed, operated, or licensed by Hilton Worldwide, Inc., a Delaware corporation that is subject to the laws of the United States, and its affiliated companies (together, "Hilton")" and that "**The First Party is an affiliate of Hilton.**"  (emphasis added). (**Ex. 16**, p, 20, Article 20 (1)).

56.     The Lease Contract further acknowledges that actions or inactions by La Perla Co. could result in claims against Hilton International, LLC.  **Ex. 16**, p. 21, Article 20(3)).

57.     The Lease Contract incorporates and **requires La Perla to comply with Hilton Standards**.  (**Ex. 16**, pp. 10, Article 8 (8.9), 27, Article 20 (10) and p. 28, Article 21 (21.3)).

58.     **Under the Lease Contract, Hilton International, LLC** had, *inter alia*, the following **powers**:

a. To approve all construction plans, drawings and specifications for all elements of the Spa, (**Ex. 16**, p. 3, Article 3-3).

b. To "enter the Rented Space for inspections and to carry out Lessor's maintenance or repair responsibilities, (**Ex. 16**, p. 9, Article 7.5);

c. **To require La Perla to "replace any employee** within two weeks from receipt of written notice from [Hilton International] stating that said employee is unacceptable to [Hilton International]." (emphasis added), (**Ex. 16**, p. 11, Article 8.12, *see also* **Ex. 17**, Appendix to the Exploitation Contract dated 11/01/2019, ¶12 ("The tenant agrees to replace any employee deemed unacceptable by the lessor within two weeks of receiving notice to that effect.")).

d. To approve La Perla's advertising and marketing materials, (**Ex. 16**, p. 23, Article 20 (4)); and

e. To prohibit La Perla from being owned, managed, controlled or financed by certain persons or entities. (**Ex. 16**, p. 25, Article 20 (7)).

59.     While Mr. Turnbow and his friends were sunbathing at the Hilton private beach, an employee wearing a polo shirt with a Hilton Hotels & Resorts logo on it approached them about booking an appointment at the Hilton Hurghada Spa.  (**Ex .6** at pp. 60-62 and **Ex. 18**, Deposition Transcript of Steven Hogan (eyewitness), pp.19-20).

### D.     The Incident

60.     The March 18, 2022, incident occurred in the sauna area of the Hilton Hurghada spa. (**Ex. 6, Turnbow Dep.**, pp. 78-85, and **Ex. 18, Hogan Dep.**, pp. 23-26).

15

61.     After the spa attendant, Mr. Yassen, escorted Mr. Turnbow into the sauna area, he turned and walked out of the sauna area.  (**Ex. 18, Hogan Dep.**, p. 28).

62.     Mr. Yassen returned with some sort of cream or lotion on his hands, approached Mr. Turnbow from behind, and within seconds went from applying the cream to Mr. Turnbow's shoulders to putting Mr Turnbow in a full nelson and cracking Mr. Turnbow's neck. (**Ex. 18, Hogan Dep.**, pp. 27-31, and **Ex. 6, Turnbow Dep.**, pp. 83-85).

63.     As Mr. Hogan described, "he [the attendant] was behind him he kind of put him in a full nelson.  So his hands were under his arms and then  his hands were behind his neck, and just kind of cracked it.  And that's when Seth [Turnbow] kind of went limp at this point"  "It was shocking when it happened…. Just seeing someone do that just out of nowhere."  (**Ex. 18, Hogan Dep.**, pp. 26-27 and 70) The full nelson hold was administered without warning to Mr. Turnbow. (**Ex. 18, Hogan Dep.**, pp. 69-70).

64.     Mr. Turnbow's other companion who witnessed the incident, Rober Nark, testified that he saw the spa attendant lift Mr. Turnbow up and "I remember hearing a loud crackling…it sounded [like] someone broke some wooden dowels or something."  (**Ex. 19**, Deposition Transcript of Rober Nark, pp. 17, 19-20).

65.     Mr. Nark heard Turnbow let out a loud groan when he was put down, "his legs came out from underneath him like a sack of potatoes," he was laying (sic) on the ground and said, 'I can't feel my legs.'" (**Id**.).

66.     As Mr. Turnbow explained, "I thought he [spa attendant] was going to start putting the lotion or massaging – give me a little bit of a pre-massage. And the next thing I know like his hands are underneath my underarms,  behind my neck, and he cracks back before I could do anything, and I was just instantly paralyzed." At this time,  "[I] could still wiggle [my] toes but

16

could not move [my] legs and feet and [I] was having trouble moving [my] arms and hands." But after Hilton personnel tried to stand him up, treated him as if he was faking it, moved him all around the hotel, refused to call an ambulance, and finally put him in a taxi, hitting his head in the process, by the time he got to the hospital, he "could no longer wiggle his toes and his arms and hands were getting worse." (**Ex. 20,** Pl's Answer to Defs' Interrogatory No. 3; **Ex. 6, Turnbow Dep.**, pp. 78-79, 86, 95-96).

67.     Mr. Yassen told the Egyptian police that he did not have a license to practice massage in a spa because his role was to guide customers to the service area.  (**Ex. 21** Egyptian Police Investigation, Interview of Ismail Yassin Muhammad Hussein, pp. Hilton International 000355–358, 000357).

68.     Mr. Turnbow is under the care of an Atlanta, Georgia neurosurgeon, Gerald E. Rodts, M.D.  Dr. Rodts operated on Mr. Turnbow's cervical spine after this incident and testified that "Mr. Turnbow suffered an acute injury when the spa employee cracked his back, which resulted in a spinal fracture and spinal cord injury that caused paralysis and/or quadriparesis."  (**Ex. 22,** Deposition Transcript of Gerald E. Rodts, M.D., p. 51).

69.     Dr. Rodts rejected Defendants' theory that fracture was not caused by the aggressive full nelson and instead could have been caused by even a slight movement, stating, "it's very uncommon for patients with metastatic cancer to have a slight movement of their head and drop to the ground quadriplegic, and – and it's just extraordinarily uncommon."  "**It's very clear what happened, you know…we're talking about an instantaneous injury**.  **Man standing up, walked into the spa, had been active on vacation, had a lot of neck pain… and then suddenly has a manipulation done to his neck and drops to the ground paralyzed with a**

**spinal cord injury.**  It's about as clear a situation as I could imagine." **(**emphasis added**) (Id**. at pp. 63, 65).

70.     Dr. Rodts testified that "**I am certain that his [Turnbow's] spinal cord injury occurred as a result of this manipulation** with him in a standing position in the spa.  (**Id**. at p. 98).

71.     Hilton's neurosurgical expert, Dr. Rivet, admitted that the hotel personnel moved Mr. Turnbow around after his spinal cord injury while he was kept at the hotel for 3 hours before finally being transported to the hospital and that, when you have a suspected spinal cord injury, you want to move them as little as possible  and keep them flat on their back and immobilized, because "once the spinal cord has been injured, further movement can cause further injury." **(Ex. 23**, Rivet Dep at 80-83).


IV.     LAW AND ARGUMENT

A. Liability

According to the Declaration of Yousef Samir Elnemr, Chief Judge and Head of the 8th Commercial Circuit in North Cairo's Elementary Court, under the facts of this case and Egyptian law, the Hilton defendants can be held liable for the actions of the Hilton hotel and spa personnel under three different legal theories. (**Ex. 1 Declaration of Yousef Samir Elnemr**).

*First*, Egyptian law provides that Hilton can be liable for the actions of its employees and agents who moved Mr. Turnbow around after he was initially injured, causing his injuries to worsen. (***Id.*** at pp. 2-5). Egyptian law recognizes joint and several liability.  EG Law No. 131 of 1948 Article (169) (*See also*, **Ex. 1**, pp. 2-3).  Furthermore, according to Judge Elnemr:

Egyptian law recognizes vicarious liability with the employer being held liable for his employee's and agent's torts/negligence. As Article 174 provides, "A master [employer] is liable for the damage caused by an illicit act [tort] of his servant [employee], when the act was performed by the servant [employee] in the course, or as a result, of his employment."

a. In this case, Hilton's neurosurgical expert, Dr. Rivet, recognized that the spa and **hotel personnel moved Mr. Turnbow around after his spinal cord injury** while he was kept at the hotel for 3 hours before finally being transported to the hospital. (Rivet Dep at 80-81). And, he admitted that when you have a suspected spinal cord injury, **you want to move them as little as possible and keep them flat on their back and immobilized, because** "once the spinal cord has been injured, **further movement can cause further injury**." (Rivet Dep at 82-83). And this is exactly what happened here.

b. As Mr. Turnbow explained, "without warning the spa attendant and/or massage therapist put [me] in a full-Nelson like wrestling hold and aggressively cracked "[my] back. This violent action produced a loud cracking sound and resulted in [my] becoming paralyzed. The Spa attendant and/or massage therapist first sat and then laid me down. *At this time, [I] could still wiggle [my] toes but could not move [my] legs and feet and [I] was having trouble moving [my] arms and hands*. Additional Hilton personnel came to the Spa to see [me]. The **Hilton personnel tried to get [me] to stand up, but [I] could not, and they then moved [me] around the spa**. Hilton personnel treated [me] as if [I] was faking [my] paralysis, refused to call for an ambulance despite [my] repeated pleas, and allowed [me] to lie in the Spa for a prolonged time. [I] called an orthopedic doctor family member who told [me] to get to a hospital immediately, but the Hilton personnel, including Hilton's Ms. Vinogradova, who also treated [me] as if [I] was faking it, still refused to call an ambulance. Instead, **Hilton personnel lifted [me] into a wheelchair, took [me] to [my] room to get [my] passport and wallet, then to an apartment adjacent to the hotel for a while, then back to the lobby**. Thereafter Ms. Vinogradova called a taxi--instead of an ambulance—to finally take [me] to the hospital. When one of the **Hilton personnel lifted [me] into the taxi, he hit [my] head on the taxi**. *By the time [I] got to the hospital [I] could no longer wiggle [my] toes and [my] arms and hands were getting worse*." (#3 of P's Responses to Defendant's First Interrogatories with Verification; See also Turnbow Dep at 95-96).

c. As Hilton's representative testified, the way it works is that although another owns the hotel building, Hilton managed the hotel and employed the hotel people on behalf of the owner, and said employees report to Hilton because Hilton manages the hotel. (Hilton 30(b)(6) Dep. at 10, 13).

d. Applying these facts to the Egyptian laws in Articles 163, 169, 174, supra, would allow Hilton to be held liable for the actions of its own, undisputed employees, who worsened Mr. Turnbow's injuries through their actions-regardless of who was responsible for causing the initial injury.

(**Id**. at pp. 3-5).

The *second theory* under which Judge Elnemr declares that Hiton may be liable in this case is as follows: "Hilton may be liable under the concepts of 'Apparent Agency' or

'Apparent Authority,' and the effects of the 'apparent situation.'" (*Id*. at p. 5).  He supports

this opinion as follows:

> Egypt's civil law system addresses this subject much like those that recognize it under common law, and the key factor is the principal's actions, which cloak an agent with the appearance of authority. While Article 145 of the Civil Code does stipulate that the effects of a contract shall be limited to its parties, and while it is normally the third party's duty to ascertain the authenticity of an agency agreement between the principal/employer they wish to contract with and the person who claims to be their agent, the Court of Cassation, widely considered the top legal authority in Egypt, has long held that contracts concluded between an apparent agent and a third party acting in good faith are considered binding for the principal/employer under the doctrine of Apparent Agency. I note that the use of the word contract here is in a broad sense of the word—meaning that Apparent Agency may be used by a claimant/plaintiff to hold a principal responsible when his dealings with the apparent agent result in a tort injury, regardless of whether an actual contract was entered into.  In any event, under Egyptian law the Spa and its employees/agents would be considered to have entered into a contractual relationship with Plaintiff Mr. Turnbow in this case to provide the spa/massage service. And the key points to holding the principal liable under Apparent Agency in a contract and tort claim are, as follows:
>
> 1) the principal-not the agent-has, through their actions or inactions, induced an illusion in the third party's mind that said agent does represent them;
>
> 2) the principal's acts that led to such an illusion were prior to the conclusion of the contract between the presumed agent and the third party;
>
> 3) the third party had acted in good faith and their false belief was justified by the circumstances of the situation 'leaving no room for doubt'; and
>
> 4)  whether or not an apparent agency situation exists is a matter of fact and Egyptian courts have the power to decide if the principal's acts are serious enough to justify the third party's false belief.

In such situations, the principal is deemed to be at fault and the legal remedy is to hold it responsible for the actions of the apparent agent. There are several Court of Cassation decisions dating as far back as 1979 and as recent as 2023, discussing this issue and providing for the above, including, but not limited to Case no. 878/46/Court of Cassation, (Dec. 29, 1979); Case no. 1171/51/Court of Cassation, (Dec. 27, 1984); Case no. 65/56/Court of Cassation, (May. 10, 1989); Case no. 1533/15/Court of Cassation, (Apr. 11, 1991); Case no. 17666/77/Court of Cassation, (May. 19, 2009); Case no. 20327/77/Court of Cassation, (Apr. 21, 2016); and Case no. 2856/76/Court of Cassation, (Oct. 28, 2023). And, notably,

> a.   Under the facts of this case, it would be perfectly reasonable under Egyptian law to find that Defendant Hilton is liable under Apparent Agency because it induced a false belief in Plaintiff Mr. Turnbow that the Hilton hotel was responsible for all areas of the hotel, including the spa, and for all the workers working in and at the hotel and spa.  These facts,

which I understand to be true and are contained in Plaintiff's statements of facts and filings for and opposing summary judgment, include the following:

b.  Defendant Hilton's web site at www.hilton.com has information on its worldwide Hilton hotels.  As the owner of www.hilton.com, Defendant Hilton International has full control over the website, including approval of the language on the site. This website includes a page for the Hilton Hurghada Plaza, which includes information about the "spa located at the Hilton Hurghada Plaza. At the top of the web page is the Hilton Hotels & Resort logo.  Before booking his stay at the Hilton Hurghada Plaza, Mr. Turnbow researched the resort on Hilton's website and saw that it described the Spa staff as "Our highly trained staff" and "Our professional staff." He relied upon these descriptions of the Hilton Hurghada's Spa, beach and pool because the purpose of his stay was to relax after days of trekking all over the desert, the pyramids and the Valley of the Kings.  He also testified that he understood that the spa was run by Hilton because it was not only inside the Hilton hotel, but because of its representations, above.

c.  The Spa was not only inside the hotel, it was on the same level as the check-in desk. And, while Mr. Turnbow and his friends were sunbathing at the Hilton's private beach, an employee wearing a polo shirt with a Hilton logo on it solicited them to book their appointment at the Spa, which they did.

d.  Additionally, when he arrived at the Hilton Hurghada Plaza Mr. Turnbow saw the giant Hilton Hotels & Resorts logo at the top of the building.  When he checked in at the Honors desk, the signage had the Hilton logo and said Hilton, not Hilton Hurghada Plaza. The pens at the desk had the Hilton logo on them. He was given a towel key card for the Hilton beach and the Hilton pool with the Hilton logo on it. All staff nametags had the Hilton logo on them. The food allergy signs in the Hilton restaurants had the Hilton logo on them. And Mr. Turnbow's bill was printed on Hilton logo letterhead. In other words, the inside of the Hilton Hurghada Plaza was also adorned with Hilton logos, from the Hilton Honors sign on the front desk, to the Check In/Check Out sign, to the Quality Manager's nameplate.

e.  From the time that Mr. Turnbow booked his stay at the Hilton Hurghada Plaza on www.hilton.com to the time he checked out and received his printed bill, Mr. Turnbow was never informed that the Hilton Hurghada Plaza was not owned by Hilton and was instead owned by Arab Investment Company.  Hilton admits that this lack of disclosure is the same for all Hilton hotels worldwide and that it is the policy of Hilton at every Hilton hotel not to inform the guests if the hotel is owned by a third party.

f.  Per the Amended Operating Agreement between Hilton and the hotel owner, Defendant Hilton managed and operated the entire Hilton Hurghada Plaza  and its Extension, which included the massage center and Spa. The Amended Operating Agreement even required the owner to comply strictly with the Hilton Brand Standards, which meant "the upscale brand for 'Hilton' hotels and resorts operating under the system elements designated by Hilton or its affiliates, from time to time, to identify hotels and resorts as 'Hilton' hotels and resorts…."

g.  Accordingly, Mr. Turnbow and any other regular person in similar circumstances would objectively have concluded that the staff of the Hilton Hurghada Plaza, including the staff of the Spa located within the Hilton Hurghada Plaza, were agents of Hilton. Indeed, the facts show that Hilton wanted its guests to have this impression, and never disclosed to its guests at any of its worldwide resorts and hotels that a property was owned

by a third party.  And, as the Spa is housed within the Hilton hotel and Hilton advertises its existence online as an available on-site Hilton amenity, an Egyptian court would likely find that Hilton encourages guests like Mr. Turnbow to believe in the spa employees' competence and thus agree to deal with them.

      **h.  Given the above overwhelming facts and applying them to Egyptian law results in the very reasonable and objective belief that the staff at the entire Hilton Hurghada Plaza resort, including the Spa staff were actual or apparent agents of the Hilton Defendants in this case.  Thus, they can be held vicariously liable and liable under the doctrine of Apparent Agency for these agents negligent acts and/or omissions in this case.**

(emphasis added) **(Id**. at pp. 5-9).

Moreover, Article 56 of the Egyptian Companies Law states:

> Any disposal effected by every employer or agent of the company will not be binding to it unless it is expressly or conclusively licensed by the General Assembly or the Administrative Board or whomsoever of their members is vested with it, as the case may be. Nevertheless, a well-intentioned third party may, invoke, in confrontation of the company, any act perpetrated by one of the staff or agents of the company, with regard at any action exercised by him if any of the authorities alluded to assert that he disposes of the power for action on its behalf, and other parties depend on such declaration in their dealings with the Company.

*EG Law No. 159/198*, Article (56).  Article 56 of the Companies Law was cited by the Claimant who invoked the apparent authority doctrine in the *Diammonium phosphate case* attached as **Exhibit 24**.  In this 2023 decision by the Cairo Regional Centre for International Commercial Arbitration (CRCICA), the Claimant cited to an Egyptian Court of Cessation decision in *Challenge No. 17666 of JY 77* dated May 19, 2009, which stated:

> According to the jurisprudence of this court, if the person dealing with the agent [is] a third party, he is considered foreign to the relationship between the agent and the principal, which requires him-principally- to investigate the capacity of the person with whom he deals on behalf of the principal […].  However, he could be exempted from [such requirement] if [an action] is taken by the principal that demonstrates, in appearance, that he had intended to delegate to another person to act on his behalf by undertaking an external appearance attributed to him that would [given an impression] to a third party that a proxy exists between him and the agent.

(**Id**. at p. 25).

In its findings based upon a review of Egyptian law, the *Diammonium* Tribunal found that "there is no active duty to verify or investigate the agency relationship in the presence of confirmed external appearance attributed to the principal." (**Id**. at p. 28).  The Tribunal noted that "good faith is not sufficient to bind a principal to the conduct of an apparent agent.  Only if the third party's good faith is accompanied by external appearance to the contrary of the truth, he/she is then protected by the law."  Citing an eminent Egyptian legal scholar, the Tribunal concluded that "[u]nless there were actions or statements inviting the third party to doubt the veracity of the agency, a *bona fide* third party may rely on the external appearances that lead to a reasonable conclusion.  The criterion of *regular person in similar circumstances* applies, resorting to an objective standard." (**Id.** at p. 29).

Mr. Turnbow and any other "regular person in similar circumstances" would objectively have concluded that the staff of the Hilton Hurghada Plaza, including the staff of the Spa located within the Hilton Hurghada Plaza were agents of Hilton.  Mr Turnbow testified that before he booked his stay at the Hilton Hurghada Plaza, he saw on Hilton's website the advertisement of the Hilton Hurghada Spa. (**Ex. 6, Turnbow Dep.** at p. 157, errata to p.73, line 12).  The Hilton website referred to the staff of the Spa at the Hilton Hurghada Plaza a "Our highly trained staff' and "Our professional staff," not as La Perla Co.'s staff.  (**Ex. 7**).

The following testimony from Defendants' deposition illustrates the point:

Q. Isn't it true that at no time between booking his stay at the Hilton Hurghada Plaza on hilton.com and checking out and getting his printed bill was Mr. Turnbow every informed that the Hilton Hurghada Plaza was owned by Arab Investment Company?
Mr. Pivor: Objection.  Calls for speculation.  You can answer.
A. No.
Q. The same would be true if Mr. Turnbow booked his stay through the app; he would not have been informed that Hilton Hurghada Plaza was owned by Arab Investment Company.
A. No.  And that's the same for all hotels worldwide.
Q. When Mr. Turnbow arrived at the Hilton Hurghada Plaza, the Hilton Honors welcome team would not have told him that Hilton did not own that hotel?

A. No, that's not a common practice.
Q. When Mr. Turnbow went to the Honors check-in-desk, there would be no signs prominently displayed telling him that Hilton did not own that hotel?
A. No.
Q. There were no signs anywhere in the lobby telling guests that Hilton does not own the Hilton Hurghada Plaza?
A. No.  And that – that's the same in any other Hilton hotel.
Q. Is the policy of Hilton at every Hilton hotel not to inform the guests if the hotel is owned by a third party?
Mr. Pivor: Objection to form.  You can answer.
A.Typically, no, because Hilton is the management company.

**(Ex. 3, Def. 30(b)(6) Dep.** at pp. 66-68).

When Mr. Turnbow researched the Hilton Hurghada Plaza on Hilton's website, the Hilton Hotels & Resorts logo was at the top of the Hilton Hurghada Plaza page.  When he arrived at the Hilton Hurghada Plaza he saw the giant Hilton Hotels & Resorts logo at the top of the building.  When he checked in at the Honors desk, the signage had the Hilton logo and said Hilton, not Hilton Hurghada Plaza.  The pens at the desk had the Hilton logo on them.  He was given a towel key card for the Hilton beach and the Hilton pool with the Hilton logo on it.  All staff nametags had the Hilton logo on them.  The food allergy signs in the Hilton restaurants had the Hilton logo on them.  Finally, when Mr. Turnbow checked out, his bill was printed on Hilton letterhead.  **(Ex. 3, Def. 30(b)(6) Dep.** at pp. 61-65).

Hilton controlled the Spa and the spa staff: among the examples of control listed in the undisputed facts was the fact that Hilton could notify La Perla to replace any spa employee for any reason upon two weeks' notice.  **(Ex. 16**, p. 11).  While Mr. Turnbow was sunbathing at the Hilton private beach, an employee wearing a polo shirt with a Hilton logo on it solicited him and his friends to book an appointment at the Spa. **(Ex. 6, Turnbow Dep.** at pp. 60-62 and **Ex. 18, Hogan Dep.**, pp. 19-20)  The Lease Contract between Arab Investment/Hilton Hughada Plaza (the "First Party") and La Perla Co. makes La Perla acknowledge that that "**The First Party is**

24

**an affiliate of Hilton."** (emphasis added). (**Ex. 16**, p, 20, Article 20 (1)). Moreover, the Lease, (**Ex. 16** at p.5), contemplates guests billing spa charges to their guest accounts, and the brand standards require that guests "be able to charge spa services and retail purchases" made at the spa to their guest account (**Ex. 5.** at p. 145). The spa receipts also require that the hotel guest's room number be provided, (**Ex. 25.**, Spa receipts), and Steve Hogan's testimony confirms that third party services provided at the hotel could be billed to guest accounts, furthering the appearance that all the staff at the hotel were agents of, and all services at the hotel were being provided by Hilton. (**Ex. 18**, Hogan Dep. at p. 81-82).

A regular person under similar circumstances who was confronted with the external appearances confronted by Mr. Turnbow would get the impression that the spa staff and all the rest of the Hilton Hurghada staff were agents of Hilton. Indeed, Hilton wanted its guests to have this impression, and as a matter of policy never disclosed to its guests at any of its worldwide resorts if the property was owned by a third party. (**Ex. 3, Def. 30(b)(6) Dep.** at pp. 66-67). Given these overwhelming facts, the staff at the entire Hilton Hurghada Plaza resort, including the Spa staff were actual or apparent agents of defendants, and defendants are vicariously liable for their negligent acts or omissions.

**B. Causation**

Judge Elnemr's *third legal basis* for why the Hilton Defendants can be found liable in this case is the Egyptian legal concept of "effective cause." He states, "[t]hird, the Hilton Defendants can be liable in this case under the three major cornerstones of liability in Egypt, which are mistake or breach of an obligation, harm, and a causal relationship between the breach and harm." (**Ex. 1.** at p. 9). Due to the temporal cause and effect of Mr. Turnbow walking into the spa, having someone forcefully and unexpectedly crack his neck, and then immediately suffering

paralysis, Chief Judge Elnemr opines that "this alone would defeat [Defendants' causation]

argument, without the need for any expert testimony under Egyptian law…." (**Id**. at pp. 9-10).

Judge Elnemr explains the "effective cause" concept and its application to this case as

follows:

> In this case, the mistake or breach and the harm are self-evident given the actions of an unlicensed spa worker cracking a guest's neck/back without warning, and instant paralysis. Thus, I will focus on the causal relationship between this breach and harm, which in this case would most certainly be found to exist under Egyptian law, as detailed below.
>
> a.  Article 165 of the Egyptian Civil Code states that the responsible party shall not be held liable if they can prove that the harm was caused by a "foreign cause that they had no hand in." However, Hilton cannot meet this burden of proof given what I understand was the Spa worker's aggressive and unexpected maneuver of cracking Mr. Turnbow's neck/back with Seth becoming instantly paralyzed. This, alone, would be enough to defeat such an argument, without the need for any expert testimony under Egyptian law, due to the obvious and temporal cause and effect, which is well within the understanding of lay people, i.e. you forcefully and unexpectedly crack someone's neck/back and they immediately suffer paralysis, you caused the paralysis.
>
> b.  Additionally, the presence of multiple causes contributing to the harm is known in Egyptian law and the Court of Cassation adopts the theory of "effective cause," which holds that the cause that normally leads to the harm is accepted as the effective cause, even if other contributing causes helped to achieve the result "Case no. 1247/51/Court of Cassation, (June 24, 1982)."
>
> c.  And, Article 221 of the Civil Code provides that, "damages include losses suffered by the creditor" and "shall be considered to be a normal result, if the creditor is not able to avoid them by making a reasonable effort," as well as that if "the obligation arises from a contract" and the debtor "is guilty of fraud or gross negligence," then the claimant can obtain "damages greater than those which could have normally been foreseen at the time of entering the contract."
>
> d.  Similarly, as Dr. El-Sanhuri explained in his well-recognized textbook, Al-Wasit, harms are categorized into two types: direct and indirect, and the direct harms are further classified as "expected" and "unexpected" harms. He gives an example of a breach of contract to rent a house: if the tenant is forced to rent a temporary residence at a higher rate as a result of the landlord's failure to provide the lodging, this is considered direct and expected harm. if some of their belongings were destroyed during the move this would be an unexpected direct harm and the landlord would only be held liable if they had committed fraud or gross negligence. If the tenant were infected by a sickness because of their temporary housing, that would be an indirect harm that the landlord is not liable to compensate, even under tort. (Sanhuri, § 451).
>
> e.  Applying the above principles to this case, it is clear that Mr. Turnbow has a strong and valid argument to claim compensation for the full extent of the damage he suffered—namely his paralysis and the effects thereof.  Whether he had bone cancer or not does not change the fact that the negligence of the Spa attendant was the "effective cause" of the

harm since bone cancer alone did not cause the spinal cord injury and the paralysis at that time. This is further supported by the fact that I understand Mr. Turnbow was physically active and had just spent days of trekking all over Egypt, its desert, the pyramids, and the Valley of the Kings, including jumping at the pyramids and riding a camel. He walked into the Spa under his own power but left paralyzed and in a wheelchair. Based on this it is absolutely reasonable to conclude under Egyptian law that were it not for the acts of the spa's employee, Seth would not have suffered this paralysis. This conclusion is further strengthened and supported by Mr. Turnbow's testimony below, as well as that of two eyewitnesses, and Mr. Turnbow's treating neurosurgeon in Atlanta.

f.  As Mr. Turnbow described it, "I thought he [spa attendant] was going to start putting the lotion or massaging – give me a little bit of a pre-massage. And the next thing I know like his hands are underneath my underarms, behind my neck, and he cracks back before I could do anything, and I was just instantly paralyzed." When he cracked my neck and spine "[y]ou could hear it all through the sauna." (Turnbow Dep 78-79, 86).

g.  As eyewitness Mr. Hogan explained, "he [the attendant] was behind him, he kind of put him in a full nelson. So, his hands were under his arms and then his hands were behind his neck, and just kind of cracked it. And that's when Seth [Turnbow] kind of went limp at that point." It "was shocking when it happened…Just seeing someone do that just out of nowhere…" (Hogan Dep 26-27, 70).

h.  Another eyewitness, Mr. Nark, described the spa employee lifting Seth up and "I remember hearing a loud cracking…it sounded [like] someone broke some wooden dowels or something," Seth let out a groan, and when he was put down, "his [Seth's] legs came out from underneath him like a sack of potatoes," he was laying on the ground and said, "I can't feel my legs." (Nark Dep 17, 19-20).

i.  If there was any doubt—and under Egyptian law there should not be given the adequacy of the testimony above in proving causation, Mr. Turnbow's treating neurosurgeon in Atlanta, Dr. Rodts, testified that, "**Mr. Turnbow suffered an acute injury when the spa employee cracked his back, which resulted in a spinal fracture and spinal cord injury that caused paralysis and/or quadriparesis**." (*Id*. at 51). It was described as an "aggressive adjustment" or "aggressive maneuver" that Mr. Turnbow did not know was about to happen. (*Id*. at 28, 51, 90-91). "[T]he arms are wrapped around him and there was a sudden thrust, you know, of force" and Mr. Turnbow was "instantly" paralyzed." (*Id*. 90-91). Dr. Rodts disagreed that this could happen even with slight movement or that it could not happen in a patient with a healthy spine, explaining that he sees healthy people with spine injuries, paralysis, death, and stroke every year from manipulations like this, and while it is not common, it happens. (*Id*., 52-53, 59). He further made clear that regarding the defense's argument that this was not caused by the aggressive maneuver and instead could have been caused by even slight movement, "that's not what has been described as what happened." (*Id*. 60). In rejecting this argument, he testified that,

It's very uncommon for patients with metastatic cancer to have a slight movement of their head and drop to the ground quadriplegic, and – and it's just extraordinarily uncommon. Usually it's -- it's more of a progression of symptoms that brings a patient to attention before something like this happened. But in this case…to me [it] doesn't apply to what happened here. It's very clear what happened, you know…

> [W]e're talking about an instantaneous injury.  Man standing up, walked into the spa, had been active on a vacation, had a lot of neck pain…and then **suddenly has a manipulation done to his neck and drops to the ground paralyzed with a spinal cord injury. It's about as clear a situation as I could imagine.**

(*Id*. 63, 65). When asked whether it was the "**aggressive maneuver that caused the paralysis**" he emphatically responded, "**Yes**," and further explained that this resulted in a "sudden compressive, you know, mechanical injury of the soft spinal cord tissue." (*Id*. 91, 93). When asked his reaction *if a medical professional or expert claimed that the sudden, aggressive maneuver had nothing to do with Mr. Turnbow's paralysis*, his answer was that,

> It makes absolutely no sense. It's -- it's a somewhat ludicrous statement. The guy is standing up on his own power, has this aggressive maneuver done, and is paralyzed instantly. To think that they're unrelated is ludicrous

(*Id*. 93). Finally, when asked his level of certainty that Mr. Turnbow suffered his spinal cord injury and paralysis because of the aggressive maneuver in the spa in Egypt, he testified, "**I am certain that his spinal cord injury occurred as a result of this manipulation with him in a standing position in the spa**" (*Id*. 98).

    j.   Given all of the above, there is every reason to conclude that under Egyptian law Mr. Turnbow can prove that the aggressive maneuver in the spa caused his injury, regardless of his underlying cancer.  This aggressive maneuver applied in the spa can cause a spinal injury in even the healthiest of patients, albeit this being uncommon, and it is very uncommon that someone in Mr. Turnbow's condition would suffer this injury and paralysis had it not been for the aggressive maneuver. Further, the testimony of Mr. Turnbow, the eyewitnesses, and Dr. Rodts, leave little doubt as to the cause of Mr. Turnbow's spinal cord injury and paralysis being the aggressive maneuver, despite my understanding that the defense and its expert claim otherwise.  In other words, the aggressive maneuver was the "effective cause" of his spinal cord injury and paralysis.

    k.   Additionally, there is nothing to indicate that Mr. Turnbow could have made a "reasonable effort" to avoid his injury, and there is an excellent argument that it was grossly negligent for what I understand was an unlicensed spa attendant who was not even supposed to treat spa guests or give massages, to perform the unexpected aggressive maneuver.  Doing this would be expected to cause harm.  As a result, Mr. Turnbow should be allowed to seek and recover for not only his normal losses for his spinal injury and paralysis, but also "damages greater than those which could have normally been foreseen at the time of entering the contract." For similar reasons, the harm/his injuries would be considered an expected direct harm for which he can recover under Egyptian law, and even if they were instead considered an unexpected direct harm, he would still be able to recover because of the gross negligence. To be clear, this is not a close call.  Given the facts and Egyptian law, Mr. Turnbow has valid—in fact quite excellent—claims against the Hilton Defendants for the spinal cord injury, paralysis, and related injuries and damages he suffered.

**(Id**. at pp. 9-15).

Defendants ignore completely the *first and second liability theories* discussed by Judge Elnemr.  With respect to Defendants' medical causation argument, Judge Elnemr opines, under the concept of "effective cause," that the case would go to the trier of fact under Egyptian law without an expert. In addition, Plaintiff has the most qualified expert on the issue of medical causation – the neurosurgeon who operated on Plaintiff's cervical spine.  The treating neurosurgeon, Dr. Rodts, testified unequivocally that the full nelson maneuver caused the fracture and paralysis.  Defendants' medical expert was an eleventh-hour substitute after their original expert announced less than one week before Defendants' expert deadline that he was no longer willing to serve as Defendants' expert[4].  Dr. Rodts characterized the opinion of Defendants' replacement expert that the full nelson had nothing to do with Mr. Turnbow's paralysis as "ludicrous."  (**Ex. 22, Rodts Dep.** at p. 93).  Applying Egyptian law on causation to Dr. Rodts' testimony compels the conclusion that the issue of causation is for the trier of fact. He testified: "**It's very clear what happened, you know…we're talking about an instantaneous injury**.  **Man standing up, walked into the spa, had been active on vacation, had a lot of neck pain… and then suddenly has a manipulation done to his neck and drops to the ground paralyzed with a spinal cord injury.**  It's about as clear a situation as I could imagine." (emphasis added) (**Id**. at pp. 63, 65).  He also testified that "**I am certain that his [Turnbow's] spinal cord injury occurred as a result of this manipulation** with him in a standing position in the spa.  (**Id**. at p. 98).

WHEREFORE, Plaintiff requests that this Court grant deny in full Defendants' his Motion for Summary Judgment.

---

[4] *See* Joint Motion to Extend the Scheduling Order [ECF No. 43, ¶s 5-6].

Respectfully submitted,

/s/ Michael G. Phelan
Michael G. Phelan, Esq. (VSB No. 29725)
Christopher P. Yakubisin, Esq. (VSB No. 91186)
PHELAN PETTY, PLC.
3315 West Broad Street
Richmond, VA 23230
804-980-7100 – Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty.com
cyakubisin@phelanpetty.com

Trent B. Speckhals, Esq. (GA Bar No. 670515)
SPECKHALS LAW, P.C.
5555 Glenridge Connector, Suite 200
Atlanta, GA 30342
770-457-9222 – Telephone
770-458-5456 – Facsimile
trent@specklaw.com
*Pro hac vice*
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2024, I filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Michael G. Phelan_____
Michael G. Phelan, Esq. (VSB No. 29725)
Christopher P. Yakubisin, Esq. (VSB No. 91186)
PHELAN PETTY, PLC.
3315 West Broad Street
Richmond, VA 23230
804-980-7100 – Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty.com
cyakubisin@phelanpetty.com
*Counsel for Plaintiffs*

31